# EXHIBIT A

CHEETAH STAFFING, LLC.

CLYDE RUNDLE

**EXHIBIT C**

**LABOR FINDERS INTERNATIONAL, INC.
FRANCHISE AGREEMENT**

# TABLE OF CONTENTS

**SECTION**                                                             **PAGE**

RECITALS ....... 1

1. GRANT OF FRANCHISE ....... 1

2. TERRITORY ....... 1
   - 2.1 Designation ....... 1
   - 2.2 Restrictions on Franchisor ....... 1
     - 2.2.1 Offices ....... 1
     - 2.2.2 Customer Services ....... 1
     - 2.2.3 Franchisor's Reserved Rights ....... 2
   - 2.3 Franchisee's Development Obligations ....... 2
     - 2.3.1 Development Requirements ....... 2
     - 2.3.2 Failure to Meet Penetration Goal ....... 2
       - A Territory Reduction ....... 2
       - B Additional Offices ....... 2
       - C Customer Servicing ....... 2
       - D Effect on Agreement ....... 2

3. TERM AND RENEWAL ....... 3
   - 3.1 Initial Term ....... 3
   - 3.2 Renewals ....... 3
     - 3.2.1 Notice ....... 3
     - 3.2.2 Debts Paid ....... 3
     - 3.2.3 Release ....... 3
     - 3.2.4 New Contract ....... 3
     - 3.2.5 Calculation of Billable Hours Invoiced ....... 3
     - 3.2.6 No Renewal Fee ....... 3

4. PAYMENTS ....... 3
   - 4.1 Initial Fee ....... 3
   - 4.2 Royalty Fee ....... 3
   - 4.3 Software Fee ....... 3
   - 4.4 Delinquent Interest ....... 4

5. FRANCHISOR'S OBLIGATIONS ....... 4
   - 5.1 Initial Training ....... 4
   - 5.2 Set-Up Package ....... 4
   - 5.3 Operations Manual ....... 4
   - 5.4 Computer Software and Hosting ....... 4
     - 5.4.1 Use ....... 4
     - 5.4.2 Confidentiality ....... 5
     - 5.4.3 Modification ....... 5
     - 5.4.4 Limitation of Warranty ....... 5
     - 5.4.5 Server Hosting Services ....... 5
     - 5.4.6 Archive Copies of Data ....... 5
     - 5.4.7 Enhancements ....... 5
     - 5.4.8 Support ....... 5

| SECTION | | | PAGE |
|---|---|---|---|

| | 5.5 | Office Location | 6 |
| | 5.6 | Forms and Promotional Supplies | 6 |
| | 5.7 | Operational Assistance | 6 |
| | | 5.7.1  Ongoing Support | 6 |
| | | 5.7.2  Administrative Services | 6 |
| | 5.8 | Hold Harmless | 6 |
| | | | 6 |
| 6. | | FRANCHISEE'S OBLIGATIONS | 6 |
| | 6.1 | Designated Office Manager | 6 |
| | 6.2 | Training | 6 |
| | 6.3 | Best Efforts | 6 |
| | 6.4 | Establishment and Continuous Operation | 7 |
| | | 6.4.1  Office | 7 |
| | | 6.4.2  Licenses | 7 |
| | | 6.4.3  Telephone | 7 |
| | | A  Usage | 7 |
| | | B  Listings | 7 |
| | | C  Advertising | 7 |
| | | D  Billings | 7 |
| | | E  Assignment upon Termination | 7 |
| | | F  Release | 7 |
| | | 6.4.4  Staff | 8 |
| | | 6.4.5  Signs | 8 |
| | | 6.4.6  Hours | 8 |
| | | 6.4.7  Development Schedule for Additional Offices | 8 |
| | 6.5 | Payment of Debts | 8 |
| | 6.6 | Books and Records | 8 |
| | 6.7 | Use of System | 8 |
| | 6.8 | Use of Marks | 8 |
| | | 6.8.1  Ownership | 9 |
| | | 6.8.2  Acquired Names and Trademarks | 9 |
| | 6.9 | Business Costs | 9 |
| | 6.10 | Advertising | 9 |
| | 6.11 | Insurance | 9 |
| | | 6.11.1  Requirements | 9 |
| | | 6.11.2  LFI Safety Management Insurance Program | 9 |
| | 6.12 | Reports | 10 |
| | | 6.12.1  Requirements | 10 |
| | | A  Data | 10 |
| | | B  Financial Statements | 10 |
| | | 6.12.2  Confidentiality | 10 |
| | 6.13 | Hold Harmless | 10 |
| | 6.14 | Laws and Regulations | 11 |

290328.9     2/03
015859.10001(164)

-ii-

**SECTION**                                                                                                          **PAGE**

7.      DATA, CONFIDENTIALITY AND UNFAIR COMPETITION ................................................... 11
        7.1     Data ...................................................................................................................... 11
        7.2     Confidential Information ...................................................................................... 11
                7.2.1   Acknowledgments of Confidentiality and Ownership ........................... 11
                7.2.2   Nondisclosure ...................................................................................... 11
                7.2.3   Exception .............................................................................................. 11
                7.2.4   Work Product ........................................................................................ 11
                7.2.5   Assignment of Improvements ............................................................... 11
                7.2.6   Return of Confidential Material ............................................................ 12
        7.3     Noncompetition .................................................................................................... 12
                7.3.1   Covenant .............................................................................................. 12
                        A       Immediate Family Members ..................................................... 12
                        B       Time Period ............................................................................. 12
                        C       Prohibited Conduct ................................................................. 12
                        D       Area ......................................................................................... 13
        7.4     No Solicitation ...................................................................................................... 13
                7.4.1   Employees ............................................................................................ 13
                7.4.2   Customers ............................................................................................ 13
        7.5     Modification .......................................................................................................... 13
        7.6     Remedies .............................................................................................................. 13
                7.6.1   Acknowledgments ................................................................................ 13
                7.6.2   Trade Secret Laws ............................................................................... 13
                7.6.3   Injunctive Relief .................................................................................... 13
                7.6.4   Survival ................................................................................................. 14
        7.7     Separate Agreements .......................................................................................... 14

8.      TRANSFER ....................................................................................................................... 14
        8.1     Transfer By Franchisee ........................................................................................ 14
                8.1.1   Restriction ............................................................................................ 14
                8.1.2   Conditions to Consent .......................................................................... 14
                        A       Debts ....................................................................................... 14
                        B       Release ................................................................................... 14
                        C       Assumption ............................................................................. 15
                        D       Qualifications .......................................................................... 15
                        E       Franchise Agreement ............................................................. 15
                        F       Training ................................................................................... 15
                        G       Transfer Fee ........................................................................... 15
                8.1.3   Security Interests ................................................................................. 15
        8.2     Franchisee's Formation of Business Entity ........................................................... 15
        8.3     Entity Franchisee .................................................................................................. 15
                8.3.1   Designated Representative5 ................................................................. 15
                8.3.2   Transfer or Issuance of Securities ....................................................... 15
                8.3.3   Activities ............................................................................................... 15
                8.3.4   Owner Guarantees ............................................................................... 16
                8.3.5   Entity Documents ................................................................................. 16
        8.4     Franchisor's Right of First Refusal ....................................................................... 16
                8.4.1   Terms .................................................................................................... 16
                8.4.2   Exceptions ............................................................................................ 16

**SECTION**                                                                                                                          **PAGE**

8.5      Death, Incapacity or Dissolution ........................................................................... 16
           8.5.1     Right to Transfer ............................................................................ 16
           8.5.2     Operation by Franchisor ................................................................. 16
8.6      Non-Waiver of Claims ....................................................................................... 17
8.7      Transfer by Franchisor ...................................................................................... 17

9.      DEFAULT AND TERMINATION ............................................................................... 17

9.1      Default Defined ................................................................................................. 17
9.2      Default by Franchisor ....................................................................................... 17
9.3      Default by Franchisee ...................................................................................... 17
           9.3.1     Nonpayment ................................................................................... 17
           9.3.2     Reports .......................................................................................... 17
           9.3.3     Standards ....................................................................................... 18
           9.3.4     Jeopardizing the Franchise Name or System ................................. 18
           9.3.5     Licensing ....................................................................................... 18
           9.3.6     Insurance ....................................................................................... 18
           9.3.7     Others ............................................................................................ 18
9.4      Without Notice .................................................................................................. 18
9.5      Multiple Franchises .......................................................................................... 18
9.6      Termination by Franchisee ............................................................................... 18
           9.6.1     Notice ............................................................................................. 18
           9.6.2     Debts Paid ...................................................................................... 18
           9.6.3     Release .......................................................................................... 18
           9.6.4     Interim Operations .......................................................................... 18
           9.6.5     Cooperation .................................................................................... 19

10.     RIGHTS AND DUTIES UPON TRANSFER, TERMINATION OR NONRENEWAL ..................... 19

10.1    Expiration or Termination .................................................................................. 19
          10.1.1    Acceleration of Payments .............................................................. 19
          10.1.2    Franchise Revoked ........................................................................ 19
          10.1.3    Marks ............................................................................................. 19
          10.1.4    Materials, Supplies and Software ................................................... 19
          10.1.5    Telephone Numbers and Listings ................................................... 19
          10.1.6    Confidential Information .................................................................. 19
          10.1.7    Continued Operation of Business by Franchisor ............................ 19
          10.1.8    Acquisition of Assets ...................................................................... 20
               A    Franchisor's Option ............................................................ 20
               B    Appraisal ............................................................................. 20
               C    Setoffs ................................................................................. 20
               D    De-Identification of Offices ................................................. 20
          10.1.9    Final Accounting ............................................................................. 20
          10.1.10  Hold Harmless .............................................................................. 20
          10.1.11  Books and Records ........................................................................ 20
10.2    Transfer ........................................................................................................... 21
10.3    Irreparable Injury .............................................................................................. 21

11.     MISCELLANEOUS ............................................................................................... 21

11.1    Independent Contractor .................................................................................... 21
11.2    Authority ........................................................................................................... 21
11.3    Retail Prices ..................................................................................................... 21

**SECTION** | | **PAGE**

| | | |
|---|---|---|
| 11.4 | Arbitration and Injunctions | 21 |
| 11.5 | Costs of Enforcement | 21 |
| 11.6 | Choice of Law and Venue | 21 |
| | 11.6.1 Applicable Law | 21 |
| | 11.6.2 Venue | 22 |
| 11.7 | Entire Agreement | 22 |
| 11.8 | Modification | 22 |
| 11.9 | Partial Invalidity | 22 |
| 11.10 | Waivers | 22 |
| | 11.10.1 Waiver of Punitive Damages | 22 |
| | 11.10.2 No Implied Waivers | 22 |
| 11.11 | Notices | 22 |
| | 11.11.1 Delivery | 22 |
| | 11.11.2 Disclosure | 22 |
| 11.12 | Interpretation | 23 |
| | 11.12.1 Time | 23 |
| | 11.12.2 Captions, Defined Terms, Number, Gender | 23 |

| | | |
|---|---|---|
| 12. | DISCLOSURE | 23 |
| 13. | APPROVAL AND GUARANTEES OF OWNERS | 23 |
| 14. | REPRESENTATIONS AND ACKNOWLEDGEMENTS/CAVEAT | 24 |
| 15. | NO WARRANTY | 24 |
| 16. | SIGNATURES | 25 |
| 17. | GUARANTY AND ASSUMPTION OF FRANCHISEE'S OBLIGATIONS | 26 |

Exhibit "1" - Terms
Exhibit "2" - Confidentiality and Noncompetition Agreement

## DEFINED TERMS

| Term | Location |
|------|----------|
| AAA | 11.4 |
| Acquired Mark | 6.8.2 |
| Agreement | First Paragraph |
| Area | 7.3.1.D |
| Billable Hours Invoiced | 4.2 |
| Confidential Information | 7.2.1 |
| Data | 6.12.1.A |
| Default | 9.1 |
| Franchise | 1 |
| Franchised Business | 1 |
| Franchisee | First Paragraph |
| Franchisor | First Paragraph |
| Immediate Family Members | 7.3.1.A |
| Incapacity | 8.5.1 |
| Initial Fee | 4.1 |
| Marks | 1 |
| Operations Manual | 5.3 |
| Penetration Goal | 2.3.1 |
| Prohibited Conduct | 7.3.1.C |
| Reduced Territory | 2.3.2.A and 2.3.2.D |
| Related Parties | 7.3.1 |
| Renewal | 3.2 |
| Renewal Term | 3.2 |
| Repeated Default | 9.4(h) |
| Royalty Fee | 4.2 |
| Safety Management Services | 6.11.2 |
| Software | 5.4 |
| Substantially All Assets | 8.1.1 |
| System | Recitals – Paragraph A |
| Territory | 2.1 and 2.3.2.D |
| Time Period | 7.3.1.B |

## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT (this **"Agreement"**) is made and entered into by and between LABOR FINDERS INTERNATIONAL, INC., a Florida corporation (**"Franchisor"**), and the undersigned (**"Franchisee"**), whose full name and address are set forth in Exhibit "1" attached hereto and incorporated herein by reference.

### RECITALS

A.      Franchisor has expended time, skill, money and effort to develop a system for recruiting and supplying temporary industrial personnel, which system incorporates certain forms, advertising formats, computer software, service methods, processes, promotional plans, market research methods, record and bookkeeping methods, procedures and policies (the **"System"**).

B.      Franchisor has also expended time, skill, money and effort in publicizing the System and the services offered under the System.  Franchisor has thereby developed and will continue to develop valuable good will in the service marks and trade names used in the System, and may develop or acquire other service marks, trademarks, trade names, logos, signs, symbols, emblems, designs, trade dresses, color schemes and slogans for use under the System all of which are or will be the sole property of Franchisor.

C.      Franchisor franchises others to use the System and its service marks, and Franchisee desires to establish and operate a business under the System and Franchisor's service marks.

NOW THEREFORE, in consideration of the recitals set forth above, which are hereby acknowledged and incorporated into this Agreement by the parties, and the promises and mutual covenants set forth below, Franchisor and Franchisee agree as follows:

1.      **GRANT OF FRANCHISE.**  Subject to the terms and conditions of this Agreement, Franchisor grants to Franchisee the franchise, and Franchisee undertakes the duty, to use the System and the service marks and trade name "LABOR FINDERS," "LF" and design, and "LABOR FINDERS" and design, together with other service marks, trademarks, trade names, logos, signs, symbols, emblems, designs, trade dress, color schemes and slogans which Franchisor may develop or acquire and designate for use by Franchisee in the future (collectively, the **"Marks"**), in the establishment and operation of a temporary industrial personnel business (the **"Franchised Business"**) in the Territory (as defined in Section 2.1) solely in connection with supplying individuals or groups as temporary unskilled, semi-skilled and skilled industrial personnel (the **"Franchise"**).

2.      **TERRITORY.**

2.1.      **Designation.**  Franchisee shall have the right to establish one or more offices and to market and supply staffing services solely in the territory described in Section 2.1 of Exhibit "1" (the **"Territory"**), subject to the provisions of Section 2.3.

2.2.      **Restrictions on Franchisor.**

2.2.1.      **Offices.**  Franchisor agrees that, as long as Franchisee is not in Default (as defined in Section 9.1) hereunder, neither Franchisor nor any person or entity licensed or franchised by it will be authorized to establish an office within the Territory for the purpose of conducting the same business as Franchisee's.  Franchisor may, however, establish or license or franchise others to establish an office outside the Territory for the purpose of conducting the same business as Franchisee's.

2.2.2.      **Customer Services.**  Franchisor agrees that, as long as Franchisee is not in Default hereunder, Franchisor will not itself solicit sales or accept orders from customers for worksites inside Franchisee's Territory.  Franchisor will also use its best efforts to prohibit any affiliate of Franchisor,

and any person or entity licensed or franchised by Franchisor, from soliciting sales or accepting orders from customers for worksites inside Franchisee's Territory.

      **2.2.3.**     <u>Franchisor's Reserved Rights</u>. Franchisee will have no claim, option or other right by reason of this Agreement to any franchise for any other area, or to a license for the use of other marks for other business purposes either outside or within the Territory. Franchisor will have the right in its sole discretion to grant others such licenses and/or to conduct and operate such businesses itself.

     **2.3.**     <u>Franchisee's Development Obligations</u>.

      **2.3.1.**     <u>Development Requirements</u>. Starting one (1) year after the effective date of this Agreement stated in Section 3.1 of Exhibit 1, Franchisee will have a minimum market penetration goal ("**Penetration Goal**") based on the population of the Territory, as stated in Section 2.3.1 of Exhibit 1. Franchisee must establish in the Territory, at locations reasonably distributed throughout the Territory and mutually agreed upon by Franchisor and Franchisee, at least one Franchise office that actively services customers for each five hundred thousand (500,000) persons residing in the Territory. Franchisee shall establish, and continue to establish, such offices at a rate of at least one additional office each year, beginning by no later than the second year this Agreement is in effect, based on the then current population of the Territory, so as to have one office for each five hundred thousand (500,000) persons residing in the Territory.

      **2.3.2.**     <u>Failure to Meet Penetration Goal</u>.

        **A.**    <u>Territory Reduction</u>. If Franchisee fails to meet its Penetration Goal, Franchisor may reduce the Territory thirty (30) days after giving Franchisee notice of the proposed reduction if Franchisee does not meet the Penetration Goal within the thirty (30) day period. Upon such a reduction, Franchisee's Territory shall be reduced to an area (the "**Reduced Territory**"): (i) within a twenty (20) mile radius around each of Franchisee's operating Franchise offices that actively services customers if the original Territory had a population of five million (5,000,000) or less; or (ii) within a ten (10) mile radius around each of Franchisee's operating Franchise offices that actively services customers if the original Territory had a population of more than five million (5,000,000), but in any event not beyond or outside of Franchisee's original Territory.

        **B.**    <u>Additional Offices</u>. If Franchisee fails to meet its Penetration Goal and the Territory is reduced, Franchisee shall have no rights outside of the Reduced Territory, including without limitation no automatic right, or right of first refusal, to open additional offices outside of the Reduced Territory. Franchisor may thereafter at any time, itself or through other franchisees, without notice to Franchisee, establish additional offices in the relinquished Territory, but not within the Reduced Territory. Franchisee may request that Franchisor grant Franchisee the right to open one or more additional offices outside of the Reduced Territory (each of which would have a Territory with the same mileage radius protection as provided in Paragraph A above), but Franchisor may refuse to grant such a right to Franchisee in its sole and absolute discretion.

        **C.**    <u>Customer Servicing</u>. If Franchisee fails to meet its Penetration Goal and the Territory is reduced, Franchisee may not service customers located outside of the Reduced Territory. Franchisor will not itself solicit sales or accept orders from customers for worksites inside Franchisee's Reduced Territory.

        **D.**    <u>Effect on Agreement</u>. Franchisee's failure to meet the Penetration Goal will not be deemed a default under Article 9 or give rise to any remedy other than as set forth in this Section 2.3.2. After any reduction of Territory as provided in Paragraph A, all references to "**Territory**" in this Agreement shall be deemed to refer to the "**Reduced Territory**".

3.       **TERM AND RENEWAL.**

    **3.1.**       **Initial Term.**  The Franchise will commence on the date specified in Section 3.1 of Exhibit "1" to this Agreement, and will continue for an initial term of ten (10) years unless sooner terminated as provided in Article 9.

    **3.2.**       **Renewals.**  If Franchisee is not then in Default and has not been in Repeated Default (as defined in Section 9.4(h)) during the twelve (12) month period immediately preceding notice of renewal, Franchisee shall have the option to renew this Agreement (a **"Renewal"**) for an unlimited number of successive ten (10) year terms (each such period being a **"Renewal Term"**), provided that all of the following conditions are met:

        **3.2.1.**       **Notice.**  Franchisee shall give Franchisor written notice of its intention to renew not less than one hundred twenty (120) days nor more than one hundred eighty (180) days prior to the end of the then current term.

        **3.2.2.**       **Debts Paid.**  All monetary obligations owed by Franchisee to Franchisor shall be satisfied.

        **3.2.3.**       **Release.**  Franchisee shall execute a general release, in form and substance satisfactory to Franchisor, of any and all claims against Franchisor and its affiliates, and their officers, directors, shareholders, employees, and agents, in their corporate and individual capacities, except any claims previously asserted in writing by notice to Franchisor and except any claims arising under any applicable state franchise disclosure or relationship law.

        **3.2.4.**       **New Contract.**  At least two (2) months prior to the expiration of the then current term of this Agreement, Franchisee shall execute the then current standard franchise agreement of Franchisor, which may contain terms and conditions substantially different from those set forth herein, including without limitation, different obligations regarding fees, royalty payments, territories and future renewal rights.  Upon renewal, Franchisee will be granted territory rights to those areas of its Territory in which it has opened offices and is actively serving customers.

        **3.2.5.**       **Calculation of Billable Hours Invoiced.**  Upon a renewal, Billable Hours Invoiced (as defined in Section 4.2) since January 1st of the year in which the Renewal occurs will be included in the calculation of Royalty Fees for the remaining portion of the year in which the Renewal occurs.

        **3.2.6.**       **No Renewal Fee.**  There are no renewal or initial fees to be paid by Franchisee upon renewal.

4.       **PAYMENTS.**

    **4.1.**       **Initial Fee.**  Upon the execution of this Agreement, Franchisee shall pay Franchisor the **"Initial Fee"** specified in Section 4.1 of Exhibit "1."  Franchisee acknowledges that the Initial Fee shall be nonrefundable and fully earned by Franchisor upon execution of this Agreement, and the granting of this Franchise constitutes the consideration for the payment of the Initial Fee.

    **4.2.**       **Royalty Fee.**  Franchisee agrees to pay Franchisor a nonrefundable monthly royalty fee ( **"Royalty Fee"**) for each office location that Franchisee operates equal to the then current federal minimum wage multiplied by the percentage specified in each applicable category in Section 4.2 of Exhibit "1" (determined by Billable Hours Invoiced since January 1 of the current year) multiplied by the number of Billable Hours Invoiced during the current month in each respective category.  Royalty Fees are due and payable at the office of Franchisor forty-five (45) days after the end of each month.  **"Billable Hours Invoiced"** includes all billed hours to Franchisee's customers for services rendered, excluding dollar amounts of interest, taxes collected and paid to taxing authorities, and transportation.  Franchisee agrees to prepare and issue all billings in the week following the week in which services are rendered or products

are delivered. Adjustments in Billable Hours may result in offsets reducing Royalty Fees owed by Franchisee to Franchisor provided that Franchisee follows the procedures in the Operations Manual.

> *Example: If Franchisee has 140,000 Billable Hours Invoiced since January 1 of the current year, of which 30,000 were invoiced in the current month, the Royalty Fee for the current month would be the sum of (i) the percentage specified in category 1 of Section 4.2 of Exhibit "1" multiplied by the federal minimum wage multiplied by 10,000, plus (ii) the percentage specified in category 2 of Section 4.2 of Exhibit "1" multiplied by the federal minimum wage multiplied by 20,000.*

**4.3.** **Software Fee.** Franchisee agrees to pay Franchisor a nonrefundable computer software fee of One Hundred Twenty-five Dollars ($125.00) per month for each copy of the Software licensed to Franchisee pursuant to Section 5.4, due and payable at the office of Franchisor on the first (1st) day of the month for the current month.

**4.4.** **Delinquent Interest.** If any sum required to be paid to Franchisor by this Agreement is not actually received by Franchisor on or before the due date, Franchisee agrees to pay interest thereon from the due date until the sum is paid. Such interest will be calculated for each day of delinquency at the lesser of a rate of one and one half percent (1.5%) per month or the highest rate of interest allowed by applicable usury laws, and will be in addition to any other rights or remedies Franchisor may have under this Agreement or otherwise.

**5.** **FRANCHISOR'S OBLIGATIONS.**

**5.1.** **Initial Training.** For a new Franchisee (whose principals have no prior involvement with the System), Franchisor will provide at no charge an initial training class for up to three (3) persons at the same time, selected by Franchisee, at Franchisor's principal place of business, or in another mutually acceptable location. Franchisee and/or its employees will be responsible for any travel, meals, lodging or personal expenses incurred by Franchisee and its employees for such training. Franchisor will be responsible for its own costs and expenses in providing the initial training.

**5.2.** **Set-Up Package.** At the conclusion of a new Franchisee's initial training or upon execution of this Agreement for an existing Franchisee, Franchisor will provide Franchisee with a set-up package including, without limitation, master artwork for use on stationery, forms and advertising.

**5.3.** **Operations Manual.** Franchisor has developed a copyrighted operations manual containing mandatory and suggested specifications, standards, procedures and rules applicable to the System (the "**Operations Manual**"). The Operations Manual is the exclusive property of Franchisor. At no charge to Franchisee, Franchisor will loan a copy of the Operations Manual to Franchisee for the term of the Franchise, and provide Franchisee with updates to the Operations Manual as they are issued. The Operations Manual and its terms and conditions, as they may be modified from time to time, are hereby incorporated herein and made a part of this Agreement by reference. At no charge to Franchisee, Franchisor may also develop and loan to Franchisee additional manuals and materials covering particular phases of the System.

**5.4.** **Computer Software and Hosting.** At the conclusion of a new Franchisee's initial training or upon execution of this Agreement for an existing Franchisee, Franchisor will license to Franchisee proprietary computer software, a user's manual and access rights by Internet or a data line (leased by Franchisee) to a server hosted by Franchisor or its agent (collectively, the "**Software**"). Franchisee agrees that it acquires no title or ownership in the Software, and that all right, title and interest in the Software is owned by Franchisor. Franchisor grants to Franchisee a nonexclusive license to use the Software in the operation of the Franchise, subject to the terms and conditions of this Agreement, including all of the following terms and conditions:

**5.4.1.**   **Use.**  Franchisee will use the Software solely with the computer hardware systems and third party software specified from time to time in the Operations Manual, and solely at locations approved by Franchisor pursuant to the terms of this Agreement.

**5.4.2.**   **Confidentiality.**  One copy of the Software will be provided to Franchisee in object code form.  Franchisee will make no copies of the Software in any format except for backup copies as permitted in accordance with the Operations Manual.  Franchisee will not create by decompilation or otherwise, the source code programs or any parts thereof from the object code program or from other information made available under this Agreement.  Franchisee will not make the Software available to any person or entity, other than to its employees who require access to the Software in order to perform their normal employment duties for Franchisee.

**5.4.3.**   **Modification.**  Franchisee will make no changes or modifications to the Software, except with the prior written consent of Franchisor, which consent may be granted or withheld for any reason, or for no reason, at the sole and exclusive discretion of Franchisor.

**5.4.4.**   **Limitation of Warranty.**

THE SOFTWARE WILL BE PROVIDED TO FRANCHISEE "AS IS" WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESSED OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

Franchisor does not warrant that the functions contained in the Software will meet Franchisee's requirements or that the operation of the Software will be uninterrupted or error free.  However, Franchisor warrants the Software diskette(s) to be free from defects under normal use for a period of ninety (90) days from the date of delivery to Franchisee.

**5.4.5.**   **Server Hosting Services.**  Franchisor will be responsible for maintaining its server, backing up data on the server on a commercially reasonable scheduled basis for the purpose of restoration in the event of server problems, and upgrading the server software, operating systems and equipment as needed.  All Data from Franchisee's offices will remain on Franchisee's computers, and will also be replicated and stored on Franchisor's server, and available to Franchisee's offices by accessing Franchisor's server.  Franchisor is not responsible for interruptions of service caused by events beyond its reasonable control.  Franchisee acknowledges that if back-ups must be used to restore data on the server, recently entered data may be lost.

**5.4.6.**   **Archive Copies of Data.**  Franchisee shall be solely responsible for making and storing its own periodic and/or permanent archive copies of the Data, and for making any periodic back-up copies necessary to restore Data in the event of problems with Franchisee's computers.  Franchisor shall not have any obligation to make any archive copies of any Data.

**5.4.7.**   **Enhancements.**  Franchisor may periodically provide to Franchisee, as the same may be developed or acquired by Franchisor, revised, updated, or enhanced proprietary computer software and/or user's manuals, in which case such new software and user's manuals will be deemed to be Software.  Unless such revised, updated or enhanced Software requires Franchisee to obtain a new computer hardware system, Franchisee will install the new Software in its computer system within fifteen (15) business days after receiving it.  If new computer hardware is required, Franchisee must obtain it and install the new Software within forty-five (45) business days after receiving the Software.  Immediately after completing such installation, Franchisee will return to Franchisor all copies of all prior editions of the Software.

**5.4.8.**   **Support.**  Franchisor will make Software support available to Franchisee by telephone during business hours.

**5.5.** **Office Location.** Franchisor will assist Franchisee in evaluating possible locations for an office at Franchisee's request.

**5.6.** **Forms and Promotional Supplies.** Franchisor, directly or through a related company, agrees to provide forms and promotional supplies to Franchisee at a reasonable profit, plus reasonable handling and shipping charges. The terms will be payment in cash or equivalent upon delivery to Franchisee, unless otherwise agreed in advance in writing.

**5.7.** **Operational Assistance.**

**5.7.1.** **Ongoing Support.** During the term of the Franchise, Franchisor agrees that it will, at its sole expense, provide Franchisee with an ongoing program of assistance which will include: (i) reasonable telephonic access to Franchisor's home office personnel for periodic consultations concerning the operation of the Franchise; (ii) periodic notifications to Franchisee of new developments and techniques concerning the operation of the Franchise; (iii) cooperation in obtaining account leads and contracts for temporary industrial personnel services; (iv) assistance in the development of sales and promotional campaigns and materials; (v) periodic analyses of the sales programs, promotional efforts, financial status and other aspects of Franchisee's business, all of which analyses will be based upon data submitted to Franchisor by Franchisee; (vi) reasonable counseling and assistance in the administration of insurance programs and claims, and in the handling of payroll taxes and unemployment claims, based upon information submitted to Franchisor by Franchisee; (vii) periodic visits to Franchisee's business; and (viii) any other ongoing support which Franchisor deems, in its sole discretion, to be advisable or necessary.

**5.7.2.** **Administrative Services.** Franchisor may offer optional administrative services to Franchisee at the current rate in effect when Franchisee elects to receive such services.

**5.8.** **Hold Harmless.** Franchisor agrees to hold harmless, indemnify and defend Franchisee and its officers, directors, owners, employees and agents against all claims for copyright, service mark or trademark infringement arising out of Franchisee's authorized use of Franchisor's materials or the Marks in accordance with this Agreement and the Operations Manual, provided Franchisee notifies Franchisor in writing within ten (10) days, or within such shorter period as is necessary to avoid prejudice, after learning of any claim, and also provided Franchisor has the right to control any litigation or proceeding resulting from any such claim.

**6.** **FRANCHISEE'S OBLIGATIONS.**

**6.1.** **Designated Office Manager.** Franchisee must designate an office manager for each office that it operates and inform Franchisor of the person's name and contact information within five (5) days of the appointment. If Franchisee will only operate one office, the office manger may be the individual franchisee, or the designated representative for a Franchisee that is a legal entity. The appointment or change of the office manager is subject to the prior written approval of Franchisor. Franchisor has the right to approve or disapprove any person(s) responsible for day-to-day management of the Franchise and to set reasonable standards (including, but not limited to, previous personnel management experience) for such office managers.

**6.2.** **Training.** Unless Franchisee or its principals have previous experience with the System, an individual Franchisee (or the designated representative for a Franchisee that is a legal entity) and each office manager must satisfactorily complete the Franchisor's training program as defined in this Agreement. Franchisor may require any new designated representative or office manager to successfully complete training by Franchisor or its agents at locations and for a period specified by Franchisor prior to the assumption of responsibilities by the designated representative or office manager. Franchisee will pay any expenses incurred by Franchisor for such training necessary because of a change of a designated representative or office manager. Franchisor reserves the right to charge a fee for this service, plus expenses.

**6.3.** **Best Efforts.** Franchisee shall diligently develop the business and market and promote the Franchise. The individual Franchisee, or its designated representative if the Franchisee is a legal entity, must use his/her best efforts and personally be responsible for management on a day-to-day basis. Franchisee shall be responsible for the performance of its designated representative and office manager(s).

**6.4.** **Establishment and Continuous Operation.** Franchisee agrees to establish its business within three (3) months of the effective date of this Agreement as specified in Section 3.1 of Exhibit "1" hereto, and to maintain the business continuously thereafter. At a minimum, establishing and maintaining the business will involve at least all of the following:

**6.4.1.** **Office.** Franchisee shall open an office within the Territory for the operation of the business, conform the office to any applicable building codes, and maintain the office in good repair and appearance. Each office lease shall expressly provide that in the event of Franchisee's default, the lessor shall give Franchisor the same notice required to be given to Franchisee, and Franchisor shall have the right, but not the obligation, to assume the lease and cure the default (the cost of which shall be immediately reimbursed to Franchisor by Franchisee). The lease shall also expressly provide that it is immediately assumable by Franchisor, at Franchisor's option, upon the termination or expiration and non-renewal of this Agreement, without the further authorization or consent of the lessor. The opening of any additional office(s), or the closure or change in location of any office, shall be communicated to Franchisor prior to such occurrence, and the leases for all additional and relocated offices shall also be subject to the terms of this Section 6.4.

**6.4.2.** **Licenses.** Franchisee shall secure and maintain all permits and licenses necessary for the establishment and operation of the Franchise business.

**6.4.3.** **Telephone.** Franchisee shall secure and maintain a new and separate local telephone listing and adequate telephone service as specified in the Operations Manual for use in the Franchise business. The telephone service shall be secured subject to the following terms and conditions:

**A.** **Usage.** The telephone service for Franchisee's temporary industrial personnel business shall not be used in conjunction with any other business or residential telephone service.

**B.** **Listings.** Franchisee shall secure white page, yellow page and information listings only under the service mark LABOR FINDERS or such other marks as Franchisee may be authorized by Franchisor in writing in advance to use. No proper names or city names may be used in conjunction with the Marks and no additional listings may be used with any telephone number(s) assigned to Franchisee's business, unless approved in writing in advance by Franchisor.

**C.** **Advertising.** All yellow page advertising, layout and copy are subject to the prior written approval of Franchisor as provided in Section 6.10.

**D.** **Billings.** Franchisee shall pay when due all charges for telephone service, yellow page advertising and information listings.

**E.** **Assignment upon Termination.** Upon the termination, or the expiration and nonrenewal, or any approved transfer of the Franchise, Franchisee acknowledges that its right to use the Marks will immediately end, and that all telephone numbers appearing under such Marks will immediately become the property of Franchisor, or of the transferee in the case of a transfer. Upon any termination or expiration and nonrenewal of the Franchise, Franchisor, at its option, may notify the telephone company either to assign all such telephone numbers to Franchisor or its designee, or to disconnect the telephone numbers and to transfer calls coming to the disconnected numbers to any telephone numbers issued by the telephone company to Franchisor or its designee. Franchisee

irrevocably authorizes the telephone company to take either of the above actions upon notification by the Franchisor. Franchisor may do all acts and execute in Franchisee's name and on its behalf any and all documents necessary to accomplish the matters specified in this Section, and Franchisee hereby irrevocably appoints and designates Franchisor as its attorney-in-fact to do so.

F.    **Release.**  Subject to applicable state law, Franchisee releases and forever discharges the telephone company, Franchisor, and their respective successors, directors, officers, employees, agents and assigns, from liability of any kind or character which may result directly or indirectly from Franchisor's exercise of its rights under this Section 6.4.3 or from the telephone company's cooperation with Franchisor in effecting the terms of this Agreement.

6.4.4.    **Staff.**  Franchisee shall have at least one qualified staff member on duty during business hours.

6.4.5.    **Signs.**  Franchisee shall install appropriate indoor and outdoor signs which have been approved by Franchisor. Franchisee must submit a written request for approval with the specifications of the requested signage. Franchisor shall be deemed to have given its approval if it has not responded to a request from Franchisee for approval within fifteen (15) days after receipt of such request.

6.4.6.    **Hours.**  Franchisee shall maintain office hours consistent with local practices concerning business hours and holidays.

6.4.7.    **Development Schedule for Additional Offices.**  Franchisee agrees to open the number of offices, in the general locations and within the time periods, as specified in Section 6.4.7 of Exhibit "1" and as required by Section 2.3.1. Franchisee may, at its option, without paying any additional Initial Fee, also open one or more additional offices in the Territory. All such offices shall be located, leased, furnished, equipped, maintained, staffed and operated in strict compliance with all the provisions of Section 6.4 and the other terms of this Agreement.

6.5.    **Payment of Debts.**  Franchisee will pay promptly when due all taxes, accounts and indebtedness of any kind incurred by Franchisee in the conduct of its Franchise business unless being contested in good faith. Franchisee agrees to notify Franchisor in writing within ten (10) days of the commencement of any action, suit, or proceeding which, if it could be decided adversely to Franchisee, could materially and adversely affect Franchisee's personal or business financial condition. Franchisee shall also notify Franchisor within ten (10) days of the issuance of any order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality which could adversely affect Franchisee's personal or business financial condition.

6.6.    **Books and Records.**  Franchisee agrees that it will at all times keep and record all sales and revenues received of every nature, kind or description in books and records of account which are maintained according to Franchisor's bookkeeping systems and procedures, consistent with generally accepted accounting principles. Franchisor will have, at all reasonable times and during business hours, the right to inspect or audit any and all books and records of Franchisee (including financial statements, and federal, state and local income tax returns). If the examination of those books and records discloses any underpayment of any sum required to be paid to Franchisor, Franchisee agrees to pay promptly the deficient sum plus interest thereon as provided in Section 4.4. If such an examination or audit discloses an underpayment of five percent (5%) or more, Franchisee will, in addition, reimburse Franchisor for the cost of having Franchisee's books and records examined and audited. The foregoing remedies will be in addition to any other rights or remedies Franchisor may have under this Agreement or otherwise.

6.7.    **Use of System.**  In connection with the operation of its business, Franchisee agrees to use the entire System, including without limitation the Software, as the System currently exists and as it may be supplemented or modified during the term of the Franchise. Franchisee acknowledges that the System must continue to evolve in order to reflect changing market conditions and to meet new and

changing customer demands. Accordingly, Franchisee agrees that Franchisor may from time to time, upon notice and acting reasonably, add to, modify or otherwise change the System, through modification of the Operations Manual or otherwise, including, without limitation, the adoption and use of new and modified Marks, forms, advertising formats, techniques and methodologies. Franchisee agrees to promptly accept, implement, use and display in the operation of its Franchise business all such additions, modifications and changes at its sole cost and expense. Franchisee will have the option of purchasing its forms and advertising formats from local sources of its choosing, provided that such forms or formats conform in all respects to the design of Franchisor's forms and formats.

6.8.     **Use of Marks**.

6.8.1.     **Ownership**. Franchisee acknowledges that Franchisor is the exclusive owner of the Marks. Franchisee agrees to use the Marks in strict accordance with the terms of this Agreement, and not otherwise. Except as expressly provided in this Agreement, Franchisee will acquire no right, title or interest in the Marks; and all good will associated with the Marks will inure exclusively to Franchisor. Franchisee will not, at any time, contest the validity or ownership of the Marks, or use any confusingly similar marks. Franchisee agrees that any use of any Mark contrary to any provisions of this Agreement will be an act of infringement, and that such use will cause irreparable injury to Franchisor and entitle Franchisor to temporary, preliminary and permanent injunctive relief from a court or agency of competent jurisdiction, court costs, reasonable expenses of litigation, reasonable attorneys' fees, and any other appropriate relief, including damages.

6.8.2.     **Acquired Names and Trademarks**. With Franchisor's prior written approval, Franchisee may, for a limited and specified transition period, use the System Marks together with the existing name and/or trademark of any temporary personnel business acquired by Franchisee (**"Acquired Mark"**) and operated under a franchise agreement with Franchisor. Any Acquired Mark which is or has been used by Franchisee for more than one (1) month shall automatically be deemed a part of the System and a Mark as defined in this Agreement, and all rights and goodwill associated with the Acquired Mark shall be owned by and inure exclusively to Franchisor; *provided, however*, that the indemnification provisions of Section 5.8 of this Agreement shall not apply with respect to any Acquired Mark.

6.9.     **Business Costs**. Except as otherwise expressly provided in this Agreement, Franchisee agrees to be responsible for all costs of operating its business, including without limitation, the costs of rent, advertising, taxes, licenses, insurance, materials and labor.

6.10.     **Advertising**. Franchisee agrees to obtain Franchisor's prior written approval of any advertising, media copy, forms or other materials which Franchisee intends to use in marketing and selling its services and products, including without limitation yellow pages, web pages and internet advertising. Franchisee is authorized to use any materials provided to Franchisee by Franchisor without Franchisor's prior written approval. For all other advertising, Franchisee must submit a written request for approval with a draft of the proposed advertising. Franchisor shall be deemed to have given its approval if it has not responded to the request from Franchisee for approval within fifteen (15) days after receipt of such request; *provided, however*, that Franchisor may thereafter notify Franchisee that the advertising is disapproved, and Franchisee shall thereafter cease any new use of the disapproved advertising.

6.11.     **Insurance**.

6.11.1.     **Requirements**. Franchisee agrees to secure and continuously maintain worker's compensation or similar insurance as required by law, and both automobile and general liability insurance in forms of coverage and with carriers acceptable to Franchisor, with limits of not less than One Million Dollars ($1,000,000) per occurrence and One Million Dollars ($1,000,000) in the aggregate. Within thirty (30) days after establishing its business and periodically thereafter at such times as policies are renewed, Franchisee shall furnish to Franchisor a certificate of insurance evidencing the limits noted above and providing that such insurance will not be canceled, amended or modified without thirty (30)

days' prior written notice to Franchisor. Each insurance policy shall name Franchisor as an additional insured. If Franchisee fails to provide or maintain any required insurance, Franchisor is authorized, but not obligated, to procure such insurance and Franchisee shall reimburse Franchisor for the cost of such insurance, within thirty (30) days after receipt of an invoice.

**6.11.2. LFI Safety Management Insurance Program.** Franchisee may, at its option, elect to participate in one or more of any insurance programs which may be offered from time to time through and at the option of Franchisor's affiliate, LFI Safety Management Services, Inc. (**"Safety Management Services"**), subject to Franchisee's acceptance into the program. If Franchisee elects to participate and is accepted into the program, then Franchisee agrees that: (a) Franchisee will comply with the Insurance Program Participation Rules established by Safety Management Services, as those Rules may be changed from time to time; (b) Franchisee will pay when due all premiums, assessments and other charges associated with the Safety Management Services insurance program; (c) that either Safety Management Services, or Franchisor on its behalf, may enforce all obligations of Franchisee with respect to the Safety Management Services insurance program; and (d) Franchisee will be eligible to participate in the Safety Management Services insurance program only while Franchisee is not in default under this Agreement and is current on all its obligations to Safety Management Services.

**6.12. Reports.**

**6.12.1. Requirements.** Franchisee agrees to prepare and furnish to Franchisor all information relating to the operation of the Franchised Business, in the format, media and frequency prescribed by Franchisor from time to time, including without limitation the following information:

**A. Data.** All customer and employee data relating to the operation of the Franchised Business including, without limitation, customer lists, customer requirements, customer contact information, customer billing and payment history, employment schedules, employee skills and contact information and employee wage information (collectively, **"Data"**). Data must be received by Franchisor within two (2) weeks following the date of which the Data is created or updated. Data that has been replicated and stored on Franchisor's server shall be deemed to have satisfied this requirement. Data shall otherwise be delivered to Franchisor by zip-disk or CD-ROM disk backups, electronic data transfer, data replication, or any other method prescribed by Franchisor.

**B. Financial Statements.** Quarterly financial statements including detailed information as specified in the Operations Manual, due within two (2) months after the end of each quarter, and annual financial statements, due within four (4) months after the fiscal year end; in each case prepared in accordance with generally accepted accounting principles and certified as accurate and complete by Franchisee; *provided, however,* that if Franchisee has any of its financial statements compiled, reviewed or audited by a certified public accountant, a copy thereof shall promptly be provided to Franchisor.

**6.12.2. Confidentiality.** Franchisor shall not disclose or communicate to others (including its other franchisees) any confidential financial information it obtains from Franchisee except as may be required in defense or prosecution of litigation, in connection with a transfer by Franchisee pursuant to Article 8, by order of a court or government agency, or otherwise by law. Franchisor may prepare and disseminate publicly consolidated statements or reports regarding the financial performance or operations of its franchisees so long as such reports do not disclose specific information or data with respect to individual franchisees.

**6.13. Hold Harmless.** Except as expressly provided in Section 5.8, Franchisee agrees to hold harmless, indemnify and defend Franchisor, and its officers, directors, shareholders, employees and agents, for any claim, including damages, losses, expenses, attorneys' fees, and costs, that arises in connection with the operation of Franchisee's business or in connection with any breach of this Agreement, regardless of whether or not caused in part by a party indemnified hereunder; *provided, however,* that Franchisee will not be required to hold harmless, indemnify or defend Franchisor or its

officers, directors, shareholders, employees or agents for any claim arising out of a breach of this Agreement or illegal conduct by Franchisor.

**6.14.** **Laws and Regulations.** Franchisee agrees to operate its business in compliance with all applicable laws and governmental regulations.

7. **DATA, CONFIDENTIALITY AND UNFAIR COMPETITION.**

**7.1.** **Data.** While this Agreement is in effect (including all Renewal Terms), Franchisor and Franchisee will have joint ownership of all Data, and Franchisee may (i) use the Data for any and all lawful purposes related to the operation of the Franchised Business, including without limitation marketing, offering and providing services under the Marks; (ii) transfer all of Franchisee's interests in the Data for value to a successor franchisee in compliance with Article 8; and (iii) reflect the Data as Franchisee's sole property for tax purposes. Franchisor may use the Data for any lawful purpose. Upon any expiration and nonrenewal, or termination of this Agreement under any circumstances, Franchisor shall automatically become the sole owner of the Data, without any payment to Franchisee.

**7.2.** **Confidential Information.**

**7.2.1.** **Acknowledgments of Confidentiality and Ownership.** Franchisee and each Related Party (as defined in Section 7.3.1) acknowledge that all of the Data, and all statistical data, advertising and promotional materials, manuals, forms, techniques, methods and procedures, the Software, and all other information and knowledge about the System which is not in the public domain, and such other information and material as Franchisor may designate as confidential (collectively, the **"Confidential Information"**) shall be deemed confidential for purposes of this Agreement. Franchisee acknowledges that, subject to Franchisee's rights under Section 7.1, Franchisor is the owner of all such Confidential Information, and that Franchisee shall acquire no interest in the Confidential Information other than to use it as expressly authorized in this Agreement. Franchisee acknowledges that the use, duplication or disclosure of the Confidential Information except as expressly permitted by this Agreement shall constitute an unfair method of competition and that Franchisor shall suffer irreparable injury thereby.

**7.2.2.** **Nondisclosure.** Franchisee acknowledges that the Confidential Information is disclosed to Franchisee in trust and confidence, and solely on the condition that Franchisee and the Related Parties agree, and each of them does hereby agree, that except as may be specifically provided for in this Agreement, they: (a) Will use the Confidential Information in strict accordance with the provisions of this Agreement and the instructions and directions given by Franchisor from time to time; (b) will not use the Confidential Information in any other business or capacity; (c) will not, at any time, while this Agreement is in effect or after the expiration, transfer or termination of this Agreement for any reason, in any manner or form, directly or indirectly, disclose, duplicate, license, sell, reveal, divulge, publish or communicate the Confidential Information, or any portion thereof, to any person or entity other than employees of Franchisee or Franchisor who need to have such information in connection with their jobs; (d) will not copy any materials containing the Confidential Information, including without limitation any manuals or computer software, without Franchisor's prior written consent; (e) will observe and implement all reasonable procedures imposed from time to time by Franchisor to prevent the unauthorized use and disclosure of the Confidential Information; (f) will keep all manuals and other materials containing any portion of the Confidential Information in a secure place; and (g) if legally compelled to disclose any Confidential Information, will do so only after using its best efforts to afford Franchisor the opportunity of obtaining appropriate protective orders or other assurances of confidentiality satisfactory to Franchisor.

**7.2.3.** **Exception.** Notwithstanding any other provisions of this Section 7.2, Franchisee and the Related Parties may disclose any of the Confidential Information on a confidential basis to their attorneys, accountants, banks, or insurance underwriters for proper business purposes.

**7.2.4.** **Work Product.** Franchisee agrees that all documents, papers, notes and other materials and work products containing or derived from the Confidential Information or connected

with the operation of Franchisee's business shall be Confidential Information. Franchisee agrees that it will have no proprietary interest in any work product developed or used by it and arising out of the operation of Franchisee's business. Franchisee will, from time to time, as may be requested by Franchisor, do all things which may be necessary to establish or document Franchisor's ownership of any such work product, including without limitation the execution of assignments.

**7.2.5.** **Assignment of Improvements.** Franchisee agrees to disclose promptly to Franchisor any and all inventions, discoveries and improvements, whether or not patentable or copyrightable, conceived or made by Franchisee or its employees or agents and related to the temporary industrial employment service business, and Franchisee agrees to assign all Franchisee's interest therein, if any, to Franchisor without compensation. Whenever requested to do so by Franchisor, Franchisee will execute any and all applications, assignments or other instruments which Franchisor shall deem necessary to apply for and obtain patents and/or copyrights or to otherwise protect Franchisor's interest therein. These obligations shall continue beyond the transfer, expiration or termination of this Agreement with respect to inventions, discoveries and improvements conceived or made by Franchisee and its employees and agents while this Agreement was in effect.

**7.2.6.** **Return of Confidential Material.** Upon the transfer, expiration or termination of this Agreement, Franchisee shall promptly return to Franchisor all copies of any materials containing the Confidential Information and all property belonging to Franchisor, in Franchisee's possession, custody or control, including any of such items produced or prepared by Franchisee or its employees or agents.

**7.3.** **Noncompetition.**

**7.3.1.** **Covenant.** Franchisee recognizes that: (a) The temporary industrial employment service business is very competitive; (b) the System is currently operated in numerous states throughout the United States and is intended to be national in scope; (c) by virtue of this Agreement and Franchisee's relationship with Franchisor, Franchisee will have access to the Confidential Information and will have close contacts with Franchisee's customers for the purpose of maintaining and further developing Franchisee's business and the business and goodwill of the System; (d) for these very reasons, Franchisee will have the attendant ability to divert customer trade; and (e) consequently, Franchisor has strong legitimate interests in obtaining the covenants herein for the protection of the business and goodwill of Franchisor and the entire System. Franchisee therefore agrees that, without the express prior written consent of Franchisor, which Franchisor may withhold in its sole absolute discretion, neither Franchisee, nor any designated representative as provided in Section 8.3.1 or any office manager as provided in Section 6.1, or other managerial or supervisory employees, nor any of Franchisee's officers, directors or owners, nor any Immediate Family Members (as defined in Paragraph A below) of any such individuals, nor any person or entity under Franchisee's control (collectively, **"Related Parties"**), shall, during the Time Period (as defined in Paragraph B below), directly or indirectly, engage in any Prohibited Conduct (as defined in Paragraph C below) within the Area (as defined in Paragraph D below); *provided, however,* that nothing in this Section 7.3.1 shall prevent a Related Party from having an ownership interest in one (1) or more other franchisees of Franchisor on a purely passive basis, which means without being an officer, director or employee of, or consultant to, the other franchisee, without participating in any way in the affairs or conduct of the other franchisee's business, and without having any access to any confidential information of the other franchisee's business.

**A.** **Immediate Family Members.** For the purposes of this Agreement, the term **"Immediate Family Members"** shall include the spouse, parents, spouse's parents, siblings, spouse's siblings, children, and the spouses of each of these individuals.

**B.** **Time Period.** For the purposes of Section 7.3 of this Agreement, the term **"Time Period"** shall mean: (a) The period while this Agreement is in effect; and (b) for a period of two (2) years after the transfer, termination or expiration and nonrenewal of this Agreement.

      **C.**   **Prohibited Conduct.** For the purposes of Section 7.3 of this Agreement, the term **"Prohibited Conduct"** shall mean rendering services or providing financing to, being employed by, or having any financial, beneficial or equitable interest in any temporary industrial employment service business.

      **D.**   **Area.** For the purposes of Section 7.3 of this Agreement, the term **"Area"** shall include: (a) The geographic area in which Franchisee provides or provided services to customers; and (b) the Territory; and (c) a radius of twenty (20) miles from each of the offices operated by Franchisee pursuant to this Agreement; and (d) a radius of twenty (20) miles from any temporary employment service business office operated or franchised by Franchisor or any of its affiliates at the time this Agreement is transferred, terminated or expires and is not renewed; and (e) while this Agreement is in effect, the entire state(s) in which Franchisee conducts its business; and (f) while this Agreement is in effect, the entire United States.

**7.4.**   **No Solicitation.**

      **7.4.1.**   **Employees.** While this Agreement is in effect, and for a period of one year thereafter, Franchisee shall not: (a) employ or solicit for employment any person who is at the time employed by Franchisor, any affiliate of Franchisor, or any other franchisee in the System, or (b) directly or indirectly induce such person to leave such employment.

      **7.4.2.**   **Customers.** For a period of one year after the transfer, termination or expiration and non-renewal of this Agreement, Franchisee shall not solicit as a customer for temporary industrial employment services: (a) Any customers to whom Franchisee provided services while this Agreement was in effect; or (b) any other persons or entities who were customers of other System franchisees or affiliates of Franchisor while this Agreement was in effect; or (c) any prospective customers to whom Franchisee made proposals or bids during the one year period before this Agreement was transferred, terminated or expired and was not renewed.

      **7.5.**   **Modification.** Each of the covenants set forth in Sections 7.1 through 7.4 inclusive shall be construed as independent of any other covenant or provision of this Agreement. Franchisor reserves the right to reduce the scope of the obligations under these covenants unilaterally and without the consent of any other person or entity, effective upon giving notice thereof. In the event that any restriction contained in Sections 7.1 through 7.4 inclusive is found to be unlawful as to scope or duration or otherwise invalid, it is the parties' intention that the covenant not be declared ineffective in its totality, but that the provision be declared invalid only to the extent of the illegality, and that the provision continue, as so revised, in full force and effect. This Agreement shall automatically be deemed amended to restate the limits of the restriction accordingly.

      **7.6.**   **Remedies.**

      **7.6.1.**   **Acknowledgments.** Franchisee, for itself and on behalf of each of its Related Parties, acknowledges and agrees that its and their experience and capabilities are such that each can obtain employment and engage in business activities which are of a different or non-competing nature from those prohibited hereunder; that the enforcement of a remedy of injunction will not prevent each of them from earning a reasonable living; and that the covenants contained in this Agreement are necessary for the protection of Franchisor's legitimate business interests and are reasonable in scope and in content.

      **7.6.2.**   **Trade Secret Laws.** The remedies set forth in this Agreement are in addition to and cumulative of any rights or remedies that may be available to Franchisor under any applicable laws relating to trade secrets and/or unfair competition, and nothing contained in this Agreement shall be construed as a waiver of any rights or remedies available to Franchisor under any applicable law.

**7.6.3.    Injunctive Relief.** In the event of an actual or threatened breach of any of the provisions of this Agreement, Franchisor shall immediately be entitled to injunctive relief restraining those responsible from the breach or threatened breach without having to show any actual damage. It is specifically agreed that Franchisor may incur incalculable and irreparable damage from any such violation, and that Franchisor has no fully adequate remedy at law and is entitled to injunctive relief for any such actual or threatened violation. Nothing herein shall be construed as prohibiting Franchisor from pursuing any other available remedies for such breach.

**7.6.4.    Survival.** The provisions of this Article 7 shall survive the transfer, termination or expiration and non-renewal of this Agreement, and shall be enforceable notwithstanding the existence of any claim or cause of action of Franchisee against Franchisor, predicated on this Agreement or any other contract or basis whatsoever.

**7.7.    Separate Agreements.** Franchisee agrees to have each of Franchisee's officers, directors, owners and managers, and each person who has access to the Confidential Information or who attends Franchisor's initial training program, execute a Confidentiality and Noncompetition Agreement in form and substance substantially in the form of Exhibit "2" attached hereto, containing substantially the same provisions as are set forth in this Article 7, which may be separately and independently enforced by Franchisor and/or Franchisee. Franchisee will provide an original, executed copy of each agreement executed pursuant to this Section 7.7 to Franchisor promptly and in any event within 30 days of its execution. Franchisee covenants and agrees that prior to appointing or electing any new director or officer, or engaging any new employee who will have a management position, attend initial training or have access to the Confidential Information, and prior to issuing or transferring any ownership interest in Franchisee to someone who is not already an owner, Franchisee will require the person to execute a Confidentiality and Noncompetition Agreement in conformity with this Section 7.7. Franchisee further agrees that it will not allow, suffer or permit access to, or knowledge of, any Confidential Information, to any person who has not executed an agreement in conformity with this Section 7.7. For each person becoming a Related Party after the effective date of this Agreement, Franchisee shall obtain an executed Confidentiality and Noncompetition Agreement from the new Related Party prior to disclosing any confidential information to the Related Party, but in all cases within 30 days after the person becomes a Related Party. A breach of this covenant will constitute a Default of this Agreement.

**8.    TRANSFER.**

**8.1.    Transfer by Franchisee.**

**8.1.1.    Restriction.** Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee, and that Franchisor has granted the Franchise in reliance on Franchisee's financial capacity and the business skills of Franchisee's management. Accordingly, neither Franchisee, nor any individual, partnership, corporation or other legal entity which directly or indirectly has an interest in Franchisee, shall sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber any interest in Franchisee, the Franchise, this Agreement, or Substantially All Assets of the Franchise business without the prior written consent of Franchisor. **"Substantially All Assets"** shall mean more than seventy-five percent (75%) of the value of the assets of the Franchise business as listed in the most recent financial statements of the Franchise. Any such purported assignment or transfer, by operation of law or otherwise, not having the prior written consent of Franchisor, shall be null and void, and shall constitute a Default of this Agreement, for which Franchisor may terminate the Franchise without opportunity to cure pursuant to this Agreement.

**8.1.2.    Conditions to Consent.** Franchisor shall not unreasonably withhold its consent to a transfer described in Section 8.1.1, *provided, however,* that Franchisor may, in its sole discretion, require as a condition to its approval that:

**A.    Debts.** All of Franchisee's accrued monetary obligations to Franchisor and its affiliates, and all other outstanding obligations relating to the Franchise business, shall be satisfied.

**B.** **Release.** The transferor shall execute a general release, in form and substance satisfactory to Franchisor, of any and all claims against Franchisor and its affiliates, and their officers, directors, shareholders, employees, and agents, in their corporate and individual capacities, except any claims previously asserted in writing by notice to Franchisor and except any claims arising under any applicable state franchise disclosure law.

**C.** **Assumption.** The transferee shall enter into a written agreement, in form and substance satisfactory to Franchisor, assuming and agreeing to discharge all of Franchisee's obligations under this Agreement and any related agreements.

**D.** **Qualifications.** The transferee shall demonstrate to Franchisor's satisfaction that it meets standards which Franchisor would normally apply to any prospective franchisee. The transferee will, for example, demonstrate that it meets Franchisor's educational, personal, managerial and business standards, possesses a good moral character and a good reputation; has the aptitude and ability to conduct the business licensed hereunder (as may be evidenced by prior related experience or otherwise); has adequate financial resources to operate the business; is financially responsible and has a good credit rating; will be likely in Franchisor's opinion to comply with the Franchise Agreement and the Operations Manual; and has no direct or indirect connection with any actual or potential competitor of Franchisor, unless waived by Franchisor.

**E.** **Franchise Agreement.** The transferee and all its Related Parties shall execute such then current franchise agreement and related agreements as Franchisor may require.

**F.** **Training.** The transferee shall successfully complete any initial training then in effect for franchisees.

**G.** **Transfer Fee.** If Franchisee makes a transfer in accordance with the terms of this Section 8.1 only, Franchisee or the transferee shall not pay any transfer fee to Franchisor.

**8.1.3.** **Security Interests.** No transfer in the nature of a grant of a security interest in the Franchise will be permitted without Franchisor's prior written consent, which consent will be at Franchisor's sole discretion. If consent is given to a transfer in the nature of a grant of a security interest, it is expressly agreed that if the holder of the security interest should ever seek to exercise the rights of Franchisee or assume the interest of Franchisee in the Franchise due to a default under any documents related to the security interest, the Franchise shall not be operated by, or subsequently transferred to, any person or entity except as provided in Section 8.1.2 and Franchisor shall have the right and option to purchase the rights of the secured party upon payment of all sums then due to such secured party.

**8.2.** **Franchisee's Formation of Business Entity.** If the proposed transfer is to a corporation or other legal entity formed by Franchisee solely for the convenience of ownership, Franchisor's consent to such transfer may, in its sole discretion, be conditioned on the following requirements: (1) Franchisee shall own a majority interest in the transferee entity, and shall act as its principal operating officer and designated representative; and (2) the conditions of Section 8.3 shall all be satisfied. If Franchisee makes a transfer in accordance with the terms of this Section 8.2, Franchisee or the transferee shall not pay any transfer fee to Franchisor.

**8.3.** **Entity Franchisee.** If Franchisee is a corporation or other legal entity, all of the following conditions shall apply:

**8.3.1.** **Designated Representative.** If Franchisee is a corporation or other legal entity, Franchisee shall designate a specific individual to be the representative of the Franchisee and shall inform Franchisor of the person's name and contact information within five (5) days of the appointment. The designated representative must satisfactorily complete initial training as required by Section 6.2.

**8.3.2.** **Transfer or Issuance of Securities.** Franchisee shall maintain restriction on transfer instructions against the transfer on its records of any ownership interest in Franchisee, and

shall also require that the following printed legend appear legibly and conspicuously on the face of each certificate of ownership:

> The transfer of any ownership interest in [Franchisee Company Name] is subject to the terms and conditions of a Franchise Agreement between Labor Finders International, Inc. and [Franchisee Company Name], a copy of which is on file with [Franchisee Company Name] and available for inspection by any owner.

8.3.3. __Activities.__ The entity's activities shall be confined exclusively to operating the Franchise.

8.3.4. __Owner Guarantees.__ Each of the owners of Franchisee who is actively involved in the Franchise shall jointly and severally guarantee the entity's performance for amounts up to their respective percentages of ownership interests in Franchisee and shall bind themselves to the terms of this Agreement and any related agreements.

8.3.5. __Entity Documents.__ Copies of Franchisee's articles of incorporation and bylaws (or equivalent governing documents) and resolutions authorizing entry into a franchise agreement, and all amendments thereto, shall be furnished to Franchisor in connection with the issuance or transfer of the Franchise. Thereafter Franchisee shall provide Franchisor with copies of the minutes of all meetings of the owners and board of directors of Franchisee (or equivalent documentation for entities other than corporations) relating to the election or appointment of the directors and officers (or the equivalent positions such as the general partners or the managing partners of a partnership, or the members of a limited liability company having management rights).

8.4. __Franchisor's Right of First Refusal.__

8.4.1. __Terms.__ Any party holding an interest in Franchisee, the Franchise, this Agreement, or the assets of the Franchised Business, and desiring to accept (or make) any bona fide offer from (or to) a third party to purchase all or part of such interest shall notify Franchisor in writing of such offer. Except as otherwise provided herein, Franchisor will have the right, exercisable within thirty (30) days after receipt of such written notification, to send written notice to the seller that Franchisor or its nominee intends to purchase seller's interest (excluding, if applicable, any extraneous assets not necessary to the operation of the Franchise), on the same terms and conditions, or their cash equivalent, as offered by (or to) the third party. Any material change in the terms of any offer prior to closing will constitute a new offer subject to the same right of first refusal by Franchisor or its nominee as in the case of an initial offer. If Franchisor or its nominee elects to purchase seller's interest, Franchisor or its nominee must use its best efforts to close on such purchase within thirty (30) days after the date of notice of the election to purchase. Failure of Franchisor to exercise the right afforded by this Section 8.4.1 shall not constitute a waiver of any other term or condition of this Agreement, including any of the other requirements of this Article 8, applicable to a proposed transfer.

8.4.2. __Exceptions.__ If a proposed transferee is the spouse, son or daughter of the transferor, or is any individual or entity already holding an equity interest in Franchisee, Franchisor shall not have any right of first refusal as provided in Section 8.4.1, but the provisions of Section 8.1.2 shall apply to any such transfer.

8.5. __Death, Incapacity or Dissolution.__

8.5.1. __Right to Transfer.__ Upon the death or Incapacity (as hereinafter defined) of any person with an interest in the Franchise, or upon the dissolution of Franchisee if it is a corporation or other legal entity, the executor, administrator, personal representative or trustee of such person or entity shall have a period of one hundred eighty (180) days after the death, determination of Incapacity, or dissolution to transfer his or its interest to a third party approved by Franchisor. Such a transfer, including, without limitation, a transfer by devise or inheritance, shall be subject to the provisions of Section 8.1.2.

"**Incapacity**" is defined as the permanent, mental or physical inability of an individual to make personal and/or business decisions as determined either by the person's family, legal representative, attending physician, or a court of law.

        **8.5.2.**    **Operation by Franchisor**.  At no time shall the Franchise business be operated by someone who has not successfully completed training as provided in Section 6.2.  Franchisor reserves the right, at its option, until an approved transfer has been made, to provide a temporary manager for the Franchise business.  Any such temporary manager provided by Franchisor shall remain an employee of or an independent contractor with Franchisor.  Franchisee shall pay Franchisor one hundred and fifty percent (150%) of such manager's regular gross compensation, plus any costs or benefits, and all reasonable costs of transportation, commuting and housing.  Franchisee shall remain solely and fully liable for all expenses, and any losses, incurred during the period the Franchise business is operated by the temporary manager.

      **8.6.**    **Non-Waiver of Claims**.  Franchisor's consent to a transfer of any interest in the Franchise shall not constitute a waiver of any claims it may have against the transferring party, nor will it be deemed a waiver of Franchisor's right to demand exact compliance with any of the terms of any agreement entered into by the transferee.

      **8.7.**    **Transfer by Franchisor**.  Franchisor shall have the right to transfer or assign all or any part of its rights or obligations under this Agreement to any person or legal entity that, in Franchisor's good faith judgment, is willing and able to assume and perform Franchisor's obligations under this Agreement.  Any successor or assignee of the Franchisor have the right to enforce all provisions in this Agreement, and the Exhibits hereto, including but not limited to the covenants of confidentiality, noncompetition and no solicitation.

**9.**    **DEFAULT AND TERMINATION.**

      **9.1.**    **Default Defined**.  "Default" as used in this Agreement means a material breach or default that has a substantial effect upon the contractual relationship of the parties or upon a substantial right of the other party, and any minor breach (unless repeatedly committed) is not a "Default."

      **9.2.**    **Default by Franchisor**.  Franchisee may terminate this Agreement for a Default by Franchisor thirty (30) days after giving Franchisor written notice of its intent, specifying the Default, if the Default remains uncured at the end of the thirty (30) day period; _provided, however,_ that if the nature of Franchisor's obligations are such that more than thirty (30) days are required for performance, then Franchisor shall not be in Default if it commences performance within the 30-day period and thereafter diligently continues and cures the Default.  If Franchisor Defaults under any provision of this Agreement, Franchisee shall have all rights and remedies permitted by law or equity, including but not limited to, the right of termination.

      **9.3.**    **Default by Franchisee**.  If Franchisee Defaults under any provision of this Agreement, Franchisor shall have all rights and remedies permitted by law or equity, including but not limited to, the right of termination.  Franchisor may terminate this Agreement without notice as provided in Section 9.4, and also thirty (30) days after giving Franchisee written notice specifying any Default by Franchisee as provided in this Section 9.3 if the Default remains uncured for thirty (30) days after notice (or such longer period as may be required by law).  The cure period shall, if permitted by law, be ten (10) days instead of thirty (30) days if the Default is under Section 9.3.1.  For the purposes of this Section 9.3, a Default shall include, but not be limited to, the following:

        **9.3.1.**    **Nonpayment.**  Failure to pay when due any sum owed to Franchisor under this Agreement, any lease obligations, any sum due vendors or suppliers, or Franchisor's affiliates, or failure to pay any undisputed taxes when due.

**9.3.2.** **Reports.** Failure to provide Franchisor with any completed report at the time and in the form specified as required under this Agreement or any lease.

**9.3.3.** **Standards.** Failure to maintain any required standard contained in this Agreement or the Operations Manual.

**9.3.4.** **Jeopardizing the Franchise Name or System.** Any misuse of any Mark or Confidential Information, or conduct which reflects unfavorably upon the operation and reputation of the System.

**9.3.5.** **Licensing.** Failure of Franchisee or Franchisee's employees to have any permit or license necessary for the operation of the Franchise.

**9.3.6.** **Insurance.** Failure of Franchisee to obtain or maintain in full force all insurance required by law, this Agreement and any lease.

**9.3.7.** **Others.** Failure to comply with any other requirement of this Agreement, failure to perform obligations imposed by any loans or leases in connection with the Franchise, failure to comply with any material obligations which Franchisee has to Franchisor, including without limitation, failure to satisfactorily complete Franchisor's training program, failure to comply with Franchisor's Operations Manual or operational memoranda reasonably issued by Franchisor, or failure to comply with advertising standards, or any other reasons allowable by applicable state or federal law.

**9.4.** **Without Notice.** If permitted by applicable law, Franchisor may terminate this Agreement without giving advance notice and without giving an opportunity to cure for any of the following: (a) Criminal misconduct; (b) any fraudulent misrepresentation relating to the acquisition or operation of the Franchise; (c) abandonment or failure to operate the Franchise business for a continuous period of three (3) or more days; (d) bankruptcy or insolvency of Franchisee; (e) giving of a no account or insufficient funds check (unless caused by bank error); (f) if any rights or obligations under this Agreement are purportedly transferred to any third party without complying with Article 8; (g) if Franchisee or any Related Party fails to comply with any covenant of noncompetition or nondisclosure; or (h) three (3) or more Defaults of this Agreement (whether of the same or different kind) within the then preceding twelve (12) months, for which Franchisee shall have received notice thereof, regardless of whether the previous Defaults were cured within the time permitted (**"Repeated Default"**).

**9.5.** **Multiple Franchises.** If permitted by applicable law, Franchisor may terminate this Agreement for any material breach or default of any other agreement between Franchisor and Franchisee which breach or default is not cured within any permitted cure period. Franchisor may also terminate all other agreements between Franchisor and Franchisee upon Franchisor's termination of this Agreement as provided in this Article 9.

**9.6.** **Termination by Franchisee.** If Franchisee is not then in Default and has not been in Repeated Default during the immediately preceding twelve (12) month period, Franchisee may terminate this Agreement at any time, with or without cause, provided that:

**9.6.1.** **Notice.** Franchisee has given Franchisor at least one hundred twenty (120) days prior written notice of termination.

**9.6.2.** **Debts Paid.** Franchisee has satisfied all monetary obligations to Franchisor and all other outstanding obligations relating to its business.

**9.6.3.** **Release.** Franchisee has executed a general release, in form and substance satisfactory to Franchisor, of any and all claims against Franchisor and its officers, directors, shareholders, employees and agents, in their corporate and individual capacities, except any claims arising under any applicable state franchise disclosure law.

9.6.4. **Interim Operations.** During the period prior to the date set for termination, Franchisee continues to operate its business.

9.6.5. **Cooperation.** Franchisee cooperates with Franchisor to expedite the transfer of its business to any person or firm that may continue to operate the business following termination.

10. **RIGHTS AND DUTIES UPON TRANSFER, TERMINATION OR NONRENEWAL.**

10.1. **Expiration or Termination.** In addition to the other rights and duties specified elsewhere in this Agreement, immediately upon the termination, or the expiration and non-renewal, of this Agreement, for any reason, the following provisions shall apply:

10.1.1. **Acceleration of Payments.** All money owed by Franchisee to Franchisor shall be due and payable.

10.1.2. **Franchise Revoked.** All rights and licenses granted to Franchisee under this Agreement shall terminate.

10.1.3. **Marks.** Franchisee shall immediately and permanently discontinue the use of the Marks, any name containing the Marks, any mark or name confusingly similar thereto, or any other designation indicating or tending to indicate that Franchisee was or is in any way an authorized Franchisee of Franchisor.

10.1.4. **Materials, Supplies and Software.** Franchisee shall promptly surrender to Franchisor or, if so directed by Franchisor, destroy and immediately discontinue the use of, all originals and copies of service marks, trademarks, trade names, signs, structures, literature, promotional materials, forms, supplies, computer software, and any other articles of personalty, indicative of Franchisor, Franchisor's products or services, or the System.

10.1.5. **Telephone Numbers and Listings.** Franchisee shall assign all primary and additional telephone numbers, telecopy (fax) numbers, beeper and pager numbers, cellular telephone numbers, e-mail addresses and web pages, and all other means of communication used by Franchisee at all of its offices or in the conduct of the Franchise business, and all listings for them and for the Franchise business, to Franchisor or its nominee, and will discontinue any radio, newspaper or other advertisements which would in any way identify Franchisee with Franchisor.

10.1.6. **Confidential Information.** Franchisee shall immediately and permanently discontinue the use of the System and any Confidential Information and materials, including Software, received pursuant to this Agreement. Franchisee shall promptly return to Franchisor all of the Confidential Information, including the Operations Manual and all other manuals, bulletins, lists, instruction sheets, forms, devices or other materials, and all copies of all of them, acquired by Franchisee pursuant to this Agreement. Franchisor shall automatically become the sole owner of the Data, as provided in Section 7.1.

10.1.7. **Continued Operation of Business by Franchisor.** Franchisee shall immediately permit Franchisor to place its employees or independent contractors in Franchisee's Territory or alternatively, at Franchisor's option, on the premises of Franchisee's office, for a period of sixty (60) days, for the purpose of continuing the operation of the business for the benefit of Franchisor and the System. Franchisee shall also immediately turn over to Franchisor: (1) a complete back-up copy of Software including all program and data files; (2) all customer lists, files and records, including without limitation job site directions, for all of Franchisee's customers; and (3) the names, telephone numbers, records and files for of all of Franchisee's permanent and part-time employees and independent contractors.

**10.1.8.** **Acquisition of Assets.**

    **A.** **Franchisor's Option.** Upon the expiration and non-renewal of this Agreement, or the early termination of this Agreement for any reason other than a transfer in compliance with Article 8, Franchisor shall have the right, but shall not be obligated, to assume the lease or take over the premises for the Franchised Business as provided in Section 6.4.1, and to purchase from Franchisee any or all of the assets of the Franchised Business, including without limitation Franchisee's land and improvements thereon (if owned by Franchisee), leasehold improvements, fixtures, motor vehicles, equipment, furniture, furnishings, supplies and inventory. Franchisor shall give written notice to Franchisee of Franchisor's intention, identifying the assets Franchisor intends to purchase, within fifteen (15) business days of the effective date of the termination or expiration. The assets shall be sold, and the purchase price paid, within thirty (30) business days after the price is established. Subject to setoffs as provided in Paragraph C below, the assets shall be sold to Franchisor free and clear, at their fair market value, excluding the value of any assets acquired by Franchisor by the foreclosure of Franchisor's security interests, to be determined by agreement between Franchisor and Franchisee or as provided in Paragraph B.

    **B.** **Appraisal.** If Franchisor and Franchisee are unable to agree upon a fair market value within seven (7) days of Franchisor's notice, fair market value shall be determined by independent appraisal. If Franchisor and Franchisee cannot agree on an independent appraiser, each shall select one, and if the two appraisers so selected are unable to agree upon fair market value within seven (7) days of their appointment, then the two appraisers shall appoint a third. If the third appraiser agrees with either of the two originally appointed appraisers, the value so established shall be the price. If there is no such agreement then, the fair market value shall be the average of: (i) the middle appraisal with a value between the highest and lowest values of the three (3) appraisals, and (ii) the appraisal with the value closest to the value of the middle appraisal. Franchisor shall have three (3) business days after receipt of the purchase price established by appraisal to accept the price and proceed with the purchase, or to cancel the purchase. Whether the sale proceeds or is cancelled, each party shall be responsible for the costs of the appraiser it selects. The costs of a single appraiser, or the third appraiser, and all other costs of appraisal, shall be divided equally.

    **C.** **Setoffs.** The purchase price payable by Franchisor to Franchisee under this Subsection 10.1.8 shall be reduced by all amounts owed by Franchisee to Franchisor and its affiliates hereunder or under any other agreement, and by the unpaid balance of the purchase price with respect to any of the assets purchased, or if any such assets are subject to a lien, by the balance due on the underlying indebtedness, together with any interest or other charges to be paid in order for Franchisor to acquire such assets free and clear.

    **D.** **De-Identification of Offices.** If Franchisor does not exercise its option to acquire any of Franchisee's office locations, Franchisee shall promptly make or cause to be made such changes in its offices, if any, as Franchisor may reasonably direct to effectively distinguish the office from the offices of other franchisees of Franchisor, all at no expense to Franchisor.

    **10.1.9.** **Final Accounting.** Franchisee and Franchisor shall make a prompt and final accounting. Any sums owing under this Agreement, or any other agreement between the parties, or any other sums owing for judgments or otherwise, shall be paid immediately and promptly by the owing party.

    **10.1.10.** **Hold Harmless.** The obligations of Franchisee and Franchisor to hold harmless, indemnify and defend each other as specified in this Agreement, shall survive the expiration or termination of the Franchise for so long as any potential for liability under any applicable law, rule, ordinance, statute or judicial decision remains. In this regard, to the maximum extent permitted by law, Franchisee and Franchisor hereby each waive the effect of any statute of limitation which would, by lapse of time, limit such obligations.

**10.1.11.** **Books and Records.** Franchisee agrees that it shall maintain all books and records after the expiration or termination of this Agreement for three (3) years and will allow Franchisor access to those books and records during that time.

**10.2.** **Transfer.** In addition to the other rights and duties specified elsewhere in this Agreement, upon a transfer of the Franchise pursuant to Article 8, the provisions of Sections 10.1.1, 10.1.2, 10.1.3, 10.1.9, 10.1.10 and 10.1.11 shall apply to Franchisee and its Related Parties as though a termination had occurred; and the provisions of Sections 10.1.4, 10.1.5 and 10.1.6 shall apply insofar as they restrict the activities of Franchisee and its Related Parties, but the property and rights referred to therein shall be transferred to Franchisee's transferee.

**10.3.** **Irreparable Injury.** Franchisee acknowledges that its violation of any covenant of this Article 10 will result in irreparable injury to Franchisor for which no fully adequate remedy at law will be available. Franchisee accordingly consents to the issuance of an injunction prohibiting any conduct by Franchisee in violation of any such covenant.

## 11. MISCELLANEOUS.

**11.1.** **Independent Contractor.** Franchisee acknowledges that it is an independent contractor, and that this Agreement does not create a fiduciary, partnership, joint venture or employment relationship between itself and Franchisor, except for Franchisor's disclosure of confidential information to Franchisee in trust. Franchisee further acknowledges that it is solely responsible for locating, training and supervising any employees and independent contractors needed to provide products and services to customers in the Territory.

**11.2.** **Authority.** Franchisee acknowledges that it has all appropriate corporate or other applicable legal authority to perform the obligations in this Agreement and a resolution authorizing this Agreement is provided to Franchisor with this Agreement.

**11.3.** **Retail Prices.** Franchisee, in its sole discretion, will establish the retail prices and fees for the services and goods it sells. If Franchisor recommends a fee, such recommendation is suggested only, and is in no way binding upon Franchisee.

**11.4.** **Arbitration and Injunctions.** Any controversy between the parties arising out of or relating to this Agreement shall be settled by binding arbitration to be held in Palm Beach Gardens, Florida, unless agreed otherwise in writing by the parties. The federal Arbitration Act shall govern the parties' choice hereunder to arbitrate, and the choice of venue for such arbitration. If arbitration is commenced, each party shall select one arbitrator from a panel of American Arbitration Association ("AAA") arbitrators, and the two so designated will select a third arbitrator. If either party fails to designate an arbitrator within seven (7) days after receiving notice of prospective panelists, or if the two arbitrators fail to select a third arbitrator within fourteen (14) days after they are both designated, then an arbitrator will be selected by the AAA upon application of either party. Arbitration will be conducted in accordance with the rules then prevailing of the AAA. Judgment upon an award rendered by the arbitrators may be entered in any court having jurisdiction thereof. Notwithstanding the foregoing, nothing in this Section 11.4 shall prevent Franchisor from seeking and obtaining injunctive relief from any court or agency of competent jurisdiction against actual or threatened conduct causing loss or damage cognizable under usual equity rules, including the rules for obtaining temporary, preliminary and permanent injunctive relief.

**11.5.** **Costs of Enforcement.** In any arbitration or action for injunctive relief, the party which substantially prevails in such arbitration or action shall be entitled to a judgment against the other party for the costs of such arbitration or action, including without limitation arbitrators' or court costs, reasonable expenses of arbitration or litigation, and reasonable attorneys' fees.

**11.6.** **Choice of Law and Venue.** This Agreement takes effect upon its acceptance and execution by a duly authorized officer of Franchisor. Franchisee acknowledges the benefits and

desirability of having the entire System governed by one body of law applied uniformly and therefore acknowledges that the following two Sections are reasonable.

**11.6.1.** **Applicable Law.** Except to the extent governed by the federal trademark, copyright and arbitration statutes, the existence, validity, construction and sufficiency of performance of this Agreement and all matters relating to it shall be governed by the laws of the State of Florida applicable to agreements made and to be entirely performed in Florida, without regard to, and without giving effect to, the application of any Florida conflict of law rules; *provided, however,* that if any of the provisions of this Agreement would not be enforceable under the laws of Florida, then such provisions shall be governed by the laws of the state in which the office of Franchisee's temporary industrial employment business is located; *and provided further* that the Uniform Franchise Offering Circular delivered to the Franchisee contains a State Law Addendum, which is hereby incorporated into this Agreement, referencing and summarizing certain existing local laws of other jurisdictions, and the application of Florida law shall not abrogate or reduce any rights of the Franchisee provided for under such existing local laws which by their terms apply and supersede Florida law (unless local law conflicts with federal law and is preempted).

**11.6.2.** **Venue.** Any proceeding brought against Franchisor shall be brought, and any action brought by Franchisor against Franchisee or any Related Party, may be brought, in the judicial district in which Franchisor has its principal place of business. The parties hereby waive all questions of personal jurisdiction or venue for the purpose of carrying out this provision. The provisions of this Section 11.6.2 are subject to applicable superseding law as provided in Section 11.6.1.

**11.7.** **Entire Agreement.** This Agreement, together with the Exhibits hereto and the documents expressly incorporated herein by reference, constitutes the entire agreement between the parties with respect to the subject matter hereof, superseding all prior written or oral agreements or representations other than the representations of Franchisor as set forth in the Offering Circular provided to Franchisee. The provisions hereof are binding upon the parties, their heirs, executors, administrators, and permitted successors and assigns.

**11.8.** **Modification.** Except as otherwise expressly provided herein, this Agreement may not be amended or modified except by a written document signed by the parties.

**11.9.** **Partial Invalidity.** In the event any term or provision of this Agreement is found to be invalid or unenforceable for any reason, the provision shall be modified to the extent necessary to make it enforceable, or if it cannot be so modified, then severed, and the remaining terms of this Agreement shall remain in full force and effect; and it is hereby declared the intention of the parties that they would have executed the Agreement as so modified.

**11.10.** **Waivers.**

**11.10.1.** **Waiver of Punitive Damages.** Franchisor and Franchisee each hereby waive to the fullest extent permitted by law any right to or claim for any consequential, punitive or exemplary damages against the other, and agree that in the event of a dispute between them each shall be limited to the recovery of any actual damages sustained.

**11.10.2.** **No Implied Waivers.** No waiver by Franchisor of any Default of Franchisee will constitute a waiver of any other Default, and no such waiver will preclude Franchisor from thereafter requiring strict compliance with this Agreement.

**11.11.** **Notices.**

**11.11.1.** **Delivery.** All notices, requests, demands, and reports to be given under this Agreement are to be in writing and delivered to the following addresses:

If to Franchisor:    Labor Finders International, Inc.
3910 RCA Blvd., Suite 1001
Palm Beach Gardens, FL 33410
Attn: President
Fax: (561) 627-6556

If to Franchisee:    As shown in Section 11.11.1 of Exhibit "1" hereto.

Notices shall be deemed to have been duly given when delivered personally or by telecopy, or one (1) business day after being sent prepaid by commercial courier service for next business day delivery, or five (5) days after being deposited in the United States mail, for certified or registered delivery, return receipt requested, postage prepaid. Either party may designate another address at any time by appropriate notice to the other. All payments and regular reports required to be made by Franchisee shall be delivered to Franchisor at the above address, but may be delivered by any means so long as they are delivered on time.

**11.11.2.  Disclosure.** The home address and telephone number of Franchisee, or Franchisee's president or chief executive officer if Franchisee is a corporation or other legal entity, are set forth in Section 11.11.2 of Exhibit "1." Franchisee shall promptly notify Franchisor of all changes to the information set forth in Section 11.11.2 of Exhibit "1." Franchisor is hereby authorized to disclose and publish such information to the extent required by law.

**11.12.   Interpretation.**

**11.12.1.  Time.** Time is of the essence of this Agreement with respect to each and every provision in which time is a factor. Wherever this Agreement refers to a period of days, the first day to be counted shall be the first day following the designated action or event; and for any period of five (5) or fewer days, only business days (excluding Saturdays, Sundays and national holidays) shall be counted. Unless expressly stated otherwise, periods longer than five (5) days shall be measured by calendar days, except that if the last day of such a period is not a business day, the period shall automatically be extended to the next business day.

**11.12.2.  Captions, Defined Terms, Number, Gender.** The table of contents and captions used in this Agreement are inserted for convenience only and shall not affect the meaning or construction of this Agreement. Capitalized terms shall have the meanings defined where such terms occur in this Agreement in bold face type and quotation marks. The language of this Agreement shall be construed simply according to its fair meaning and not strictly for or against either party. If Franchisee shall be two or more persons and/or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits granted herein may only be exercised and enjoyed jointly; the liabilities and responsibilities hereunder assumed, however, shall be the joint and several obligations of such persons or entities. Words in this Agreement shall be deemed to refer to whatever number or gender the context requires. It is the intention of the parties hereto that if any provision in this Agreement is capable of two constructions, one of which would render the provision void and the other of which would render the provision valid, then the provision shall have the meaning which renders it valid. Each item and provision of this Agreement to be performed by Franchisee shall be construed to be both a covenant and a condition.

**12.   DISCLOSURE.** By execution of this Agreement, Franchisee acknowledges receipt of Franchisor's Uniform Franchise Offering Circular on the earlier of: (a) ten (10) business days prior to the execution of this Agreement, (b) ten (10) business days before making any payment, or (c) at the first personal meeting with Franchisor.

**13.   APPROVAL AND GUARANTEES OF OWNERS.** If Franchisee is a corporation or other form of legal entity, Franchisor shall not be bound unless and until all owners and their spouses approve this Agreement, agree to the restrictions placed on them (including, but not limited to, restrictions on the

transfer of their interests, limitations on their ability to compete, and prohibitions on their use of Confidential Information), and guarantee to pay Franchisor all sums owed or which may be owed pursuant to this Agreement. The guarantors must execute the "Guaranty and Assumption of Franchisee's Obligations," at Article 17, which forms a part of this Agreement.

### 14. REPRESENTATIONS AND ACKNOWLEDGEMENTS/CAVEAT.

NO PERSON HAS THE AUTHORITY TO BIND OR OBLIGATE FRANCHISOR EXCEPT AN AUTHORIZED OFFICER OF FRANCHISOR BY A WRITTEN DOCUMENT. NO REPRESENTATION AS TO PROJECTIONS, EARNINGS CLAIMS, POTENTIAL SUCCESS, FUTURE PROFITS, PROMISES, GUARANTEES, OR WARRANTIES OF ANY KIND WERE OR ARE MADE BY THE FRANCHISOR OR ITS REPRESENTATIVES. THE PARTY EXECUTING THIS AGREEMENT UNDERSTANDS THAT ITS SUCCESS WILL DEPEND PRIMARILY UPON ITS OWN EFFORTS AND JUDGMENTS AND THE SERVICES OF THOSE IT EMPLOYS.

FRANCHISEE ACKNOWLEDGES THAT IT HAS RECEIVED, READ, AND UNDERSTANDS THIS AGREEMENT AND THE EXHIBITS AND THE OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THAT IT HAS HAD AN OPPORTUNITY TO ASK FRANCHISOR ALL ITS QUESTIONS RELATING TO THIS AGREEMENT AND THE FRANCHISE SYSTEM, AND THAT FRANCHISOR HAS ANSWERED ALL SUCH QUESTIONS TO FRANCHISEE'S SATISFACTION; AND THAT FRANCHISOR HAS ACCORDED FRANCHISEE AMPLE TIME AND OPPORTUNITY TO CONSULT WITH ADVISORS OF ITS OWN CHOOSING ABOUT THE POTENTIAL BENEFITS AND RISKS OF ENTERING INTO THIS AGREEMENT.

FRANCHISEE UNDERSTANDS AND AGREES THAT FRANCHISOR HAS NO OBLIGATION TO ACCEPT THIS APPLICATION AND MAY REFUSE TO GRANT A FRANCHISE FOR ANY REASON, OR NO REASON, WITHOUT DISCLOSING THE BASIS FOR ITS DECISION. UNTIL FRANCHISOR NOTIFIES FRANCHISEE IN WRITING THAT THE FRANCHISE HAS BEEN GRANTED, IT IS NOT A FRANCHISEE AND MAY NOT RELY UPON BECOMING A FRANCHISEE.

THE SUCCESS OF THE FRANCHISE IS SPECULATIVE AND DEPENDS UPON VARIOUS FACTORS BEYOND FRANCHISOR'S CONTROL, SUCH AS THE ABILITY AND EFFORTS OF FRANCHISEE AS AN INDEPENDENT BUSINESS PERSON. FRANCHISOR DOES NOT MAKE ANY REPRESENTATION OR WARRANTY AS TO THE POTENTIAL SUCCESS OF THE TEMPORARY EMPLOYMENT SERVICE BUSINESS CONTEMPLATED. FRANCHISEE HAS MADE AN INDEPENDENT INVESTIGATION OF FRANCHISOR'S OPERATIONS AND HAS NOT ENTERED INTO THIS AGREEMENT UPON ANY REPRESENTATION AS TO PROFITS OR SUCCESS WHICH FRANCHISEE MIGHT ANTICIPATE.

### 15. NO WARRANTY.

FRANCHISEE ACKNOWLEDGES THAT NO APPROVALS, WAIVERS, OR CONDITIONS, OR THE LIKE BY FRANCHISOR (INCLUDING, BUT NOT LIMITED TO, SITE APPROVAL, LEASE APPROVAL, CONTRACT APPROVAL FOR PURCHASE OF LAND, CONSTRUCTION PLAN APPROVAL, MANAGEMENT APPROVAL, OR INSURANCE APPROVAL, *ETC.*) WARRANT THE SUCCESS OF THE FRANCHISE OR THE APPROPRIATENESS OR LEGALITY OF THE PARTICULAR ITEM SO APPROVED. SUCH APPROVAL MEANS ONLY THAT THE MATTER APPROVED MEETS FRANCHISOR'S MINIMUM SPECIFICATIONS. FRANCHISEE SHOULD OBTAIN INDEPENDENT PROFESSIONAL GUIDANCE AS TO ALL ASPECTS OF ITS BUSINESS OPERATIONS AND EXPRESSLY ACKNOWLEDGES THAT IT IS NOT IN ANY WAY RELYING ON FRANCHISOR'S APPROVALS, CONSENTS, WAIVERS, CONDITIONS, OR THE LIKE. FRANCHISOR MAKES NO WARRANTIES OR GUARANTEES UPON WHICH FRANCHISEE MAY RELY AND ASSUMES NO LIABILITY OR OBLIGATION TO FRANCHISEE BY GRANTING ANY WAIVER, APPROVAL, OR CONSENT TO FRANCHISEE, OR BY REASON OF ANY NEGLECT, DELAY OR DENIAL OF ANY REQUEST THEREOF.

16.  **SIGNATURES.**  IN WITNESS WHEREOF, the parties have signed this Franchise Agreement on the date(s) set forth below, to be effective as of the date specified in Section 3.1 of Exhibit "1" hereto.

FRANCHISEE:                                   FRANCHISOR:

_Clyde D. Rundle_ (signature)                 LABOR FINDERS INTERNATIONAL, INC.

By: _Clyde D. Rundle_                         By: _Robert R. Gallagher_

Title: _President_                            Title: _VP FRANCHISE DEVELOPMENT_

Date: _4·16·03_                               Date: _4/17/03_

Witness: _Molly C. R_                         Witness: _Jm Phipps_

17. **GUARANTY AND ASSUMPTION OF FRANCHISEE'S OBLIGATIONS.** In consideration of, and as an inducement to, the execution of the foregoing Franchise Agreement (the "**Agreement**") by and between Labor Finders International, Inc. ("**Franchisor**"), and ___Cheetah Staffing LLC___ ("**Franchisee**"), each of the undersigned (being collectively all of the owners of Franchisee and their spouses) hereby personally and unconditionally: (1) guarantees to Franchisor and its successors and assigns, for the term of the Agreement and all renewals thereof, and thereafter as provided in the Agreement, that Franchisee shall punctually pay and perform each and every undertaking, agreement, and covenant set forth in the Agreement; and (2) agrees to be personally bound by, and personally liable for any breach or default by Franchisee of any provision in the Agreement.

Each of the undersigned waives: (1) acceptance and notice of acceptance by Franchisor of the foregoing undertakings; (2) notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guaranteed; (3) protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed; (4) any right he/she may have to require that an action be brought against Franchisee or any other person as a condition of liability; and (5) any and all other notices and legal or equitable defenses to which he/she may be entitled.

Each of the undersigned consents and agrees that: (1) his/her direct and immediate liability under this guaranty shall be joint and several; (2) he/she shall render any payment or performance required under the Agreement upon demand if Franchisee fails or refuses punctually to do so; (3) he/she will individually comply with the terms and provisions of the Franchise Agreement and all renewal franchise agreements, including without limitation the provisions of Section 11.6 regarding choice of law and venue; (4) such liability shall not be contingent or conditioned upon pursuit by Franchisor of any remedies against Franchisee or any other person; and (5) such liability shall not be diminished, relieved, or otherwise affected by any extension of time, credit, or other indulgence which Franchisor may from time to time grant to Franchisee or to any other person, including without limitation the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which shall in any way modify or amend this guaranty, which shall be continuing and irrevocable during the term of the Agreement and all renewals thereof, and thereafter with respect to those provisions which survive expiration, termination or transfer.

If any provision of this Guaranty and Assumption is deemed to be invalid or inoperative for any reason, that part shall be deemed modified to the extent necessary to make it valid and operative or if it cannot be so modified, then severed, and the remainder of the Guaranty and Assumption shall continue in full force and effect as if it had been signed with the invalid portion so modified or eliminated.

IN WITNESS WHEREOF, each of the undersigned has hereunto affixed his/her signature effective as of the same day and year as the Franchise Agreement was executed.

| GUARANTOR(S) | INTEREST/POSITION WITH FRANCHISEE | PERCENT OF OWNERSHIP | DATE |
|---|---|---|---|
| Clyde O. Rundle | President | 49% | 4-16-03 |
| Barbara J. Rundle | Chairman | 51% | 4-16-03 |
| | | | |
| | | | |
| | | | |

**EXHIBIT "1"**
**TO**
**FRANCHISE AGREEMENT**

**T E R M S**

**Franchisee.** Franchisee's full legal name is ___Cheetah Staffing LLC___

Franchisee is a/an ___ILLINOIS CORPORATION_____, whose business address
is:

             [state]             [type of business entity]

      ___Il___        ___LLC___

      ___28309 West Savannah Trail___

      ___Lake Barrington Il 60010___

Attention: ___Mr. Clyde Rundle___

Telephone: ___(847) 382-2224___

Fax: ___847.382.2226___

    **2.1. Territory.** Franchisee's Territory shall be: ___LAKE AND DUPAGE COUNTIES OF
ILLINOIS, KENOSHA, RACINE AND MILWAUKEE COUNTIES OF WISCONSIN___

    **2.3.1 Population of Territory.** Franchisee and Franchisor agree that as of the most recent
available information, which is for the year **2003**, the population of the Territory is: **2,827,089**. Franchisee
further acknowledges that if the population of the Territory increases over time, then in addition to the
Development Schedule set forth in Section 6.4.7 below, Franchisee will be obligated to put additional
Franchise offices in the Territory according to the formula provided in Section 2.3.1 of the Agreement.

    **3.1. Effective Date.** The Franchise Agreement and Franchise shall be effective as of, and

commence on ___JULY, 15_____, 2003.

    **4.1. Initial Fee.** The Initial Fee to be paid by Franchisee to Franchisor shall be $ _10,000.00_

**EXHIBIT "2" TO FRANCHISE AGREEMENT**
**CONFIDENTIALITY AND NONCOMPETITION AGREEMENT**
PAGE 1 OF 3

**4.2. Royalty Fee.** The Royalty Fee percentage shall be:

| Category | Royalty Fee Percentages of Federal Minimum Wage for Billable Hours Invoiced in Category | Billable Hours Invoiced by Individual Office Since January 1 of the Year |
|---|---|---|
| 1 | 8% | 0 - 120,000 |
| 2 | 7% | 120,000.01 – 140,000 |
| 3 | 6% | 140,000.01 – 160,000 |
| 4 | 5% | 160,000.01 and over |

**6.4.7 Development Schedule.** Franchisee agrees to open and continuously thereafter operate Franchise offices that actively service customers as required by the following chart:

| General Location of Office To Be Opened | Time Period To Open Office (Months Elapsed from Date of Agreement) | Cumulative Number of Open Offices Required |
|---|---|---|
| LAKE COUNTY, IL. POP. 644,356 | 3 | 1 |
| DUPAGE COUNTY, IL POP. 904,161 | JULY 15, 2004 | 2 |
| KENOSHA COUNTY, WI. POP. 149,577 | JULY 15, 2005 | 3 |
| RACINE COUNTY, WI. POP. 188,831 | JULY 15, 2006 | 4 |
| MILWAUKEE COUNTY, WI. POP. 940,164 | JULY 15, 2007 | 5 |
| | | |

**11.11.1. Notice to Franchisee.** Notices to Franchisee shall be delivered to the following address:

MR. CLYDE RUNDLE

28309 W. SAVANNAH TRAIL

LAKE BARRINGTON, IL 60010

Fax: (847) 382 2226

**11.11.2. Home Address and Telephone Number.** The name, home address and telephone number of Franchisee, or Franchisee's president or chief executive officer if Franchisee is a corporation or other legal entity, are:

_____MR. CLYDE RUNDLE___

_____28309 W. SAVANNAH TRAIL_

_____LAKE BARRINGTON, IL  60010__

_____

Telephone Number:  (_847) 382-2224

# ILLINOIS AMENDMENT
# TO
# FRANCHISE AGREEMENT

This Illinois Amendment (the **"Amendment"**) is made by and between LABOR FINDERS INTERNATIONAL, INC., a Florida corporation (**"Franchisor"**), and the undersigned (**"Franchisee"**), as an amendment to the Franchise Agreement (the **"Franchise Agreement"**) dated as shown on Exhibit "1" to Franchise Agreement, by and between Franchisor and Franchisee, and is to be effective concurrently with the Franchise Agreement.

    **1.**     <u>Defined Terms.</u> All capitalized terms used in this Amendment shall have the meanings defined in the Franchise Agreement unless otherwise expressly defined in this Amendment.

    **2.**     <u>Renewal.</u> Section 3.2.3 of the Franchise Agreement is hereby deleted in its entirety.

    **3.**     <u>Choice of Law and Venue.</u> Section 11.6 of the Franchise Agreement is hereby deleted in its entirety and replaced by the following:

    **"11.6**     <u>Choice of Law and Venue.</u> This Agreement takes effect upon its acceptance and execution by a duly authorized officer of Franchisor.

    **"11.6.1**     <u>Applicable Law.</u> Except to the extent governed by the U.S. Trademark Act, 15 U.S.C. §§ 1051 *et seq.*, this Agreement shall be governed by Illinois law.

    **"11.6.2**     <u>Venue.</u> Any arbitration proceeding brought against Franchisor shall be brought, and any arbitration proceeding brought by Franchisor against Franchisee or any Related Party, may be brought, in the judicial district in which Franchisor has its principal place of business. Any judicial proceeding brought against Franchisor may be brought, and any judicial proceeding brought by Franchisor against Franchisee or any Related Party, shall be brought in Illinois. The parties hereby waive all questions of personal jurisdiction or venue for the purpose of carrying out this provision."

    **4.**     <u>Disclosure.</u> Section 12 of the Franchise Agreement is hereby deleted in its entirety.

    **5.**     <u>Representations and Acknowledgements/Caveat.</u> The last sentence in the last paragraph of Section 14 is amended to read: "FRANCHISEE HAS MADE AN INDEPENDENT INVESTIGATION OF FRANCHISOR'S OPERATIONS."

    **6.**     <u>Warranty.</u> Section 15 of the Franchise Agreement is hereby deleted in its entirety.

    **7.**     <u>Interpretation.</u> In the event of any conflict between the express provisions of this Amendment and the Franchise Agreement, the terms of this Amendment shall control. This Amendment is hereby incorporated by reference into the Franchise Agreement. Except as expressly amended by this Amendment, the Franchise Agreement shall remain in full force and effect.

    IN WITNESS WHEREOF the parties hereto have executed this Amendment to be effective concurrently with the Franchise Agreement.

| FRANCHISEE | FRANCHISOR |
|---|---|
| Cheetah Staffing LLC | LABOR FINDERS INTERNATIONAL, INC. |
| By: _(Signature)_ | By: _(Signature)_ |
| Clyde D. Rundle (Name: Type or Print) | Robert R. Gallagher (Name: Type or Print) |
| Title: President | Title: VP Franchise Development |
| Date: April 16, 2003 | Date: April 17, 2003 |

273871.5  3/01
015859.10001(166)

ILLINOIS



# ADDITIONAL TERRITORY AMENDMENT
TO
## FRANCHISE AGREEMENT
### [WITHOUT MASTER AMENDMENT]

This Additional Territory Amendment (this **"Territory Amendment"**) is made to be effective as of the date specified in Section 2 below (the **"Amendment Date"**), by and between LABOR FINDERS INTERNATIONAL, INC., a Florida corporation (**"LFI"**), and the Franchisee identified in Section 1 below, as an amendment to the Franchise Agreement dated as stated in Section 2 below, between LFI and Franchisee (collectively the **"Parties"**), and if applicable, as may have been otherwise previously amended by the Parties (as amended, the **"Franchise Agreement"**).

1. **Franchisee.**

| Cheetah Staffing LLC<br><br>[full legal name] | Illinois<br><br>[state where formed] | Limited Liability Company<br>[type of business entity] |
|---|---|---|

2. **Dates.**

| July 15, 2003<br>[Date of original Franchise Agreement] | January 23, 2006<br>[Effective date of this Territory Amendment] |
|---|---|

3. **Additional Territory.** Effective as of the Amendment Date, Franchisee's Territory shall be increased to include the following additional Territory (the **"New Territory"**):

**Kane County, Illinois**

4. **Population of New Territory and Development Schedule.** Franchisee and LFI agree that as of the most recent available information, which is for the year 2000, the population of the New Territory is: _404,119_. Franchisee agrees to open and continuously thereafter operate Offices in the New Territory that actively service customers as required by the following chart:

| General Location of Office(s) To Be Opened | Date(s) by Which Office(s) Must Be Opened & Operating | Cumulative No. of Open & Operating Offices Required |
|---|---|---|
| Elgin, Illinois | March 1, 2006 | 1 |
| | | 2 |
| | | 3 |
| | | 4 |
| | | 5 |
| | | 6 |
| | | 7 |
| | | 8 |
| | | 9 |
| | | 10 |

600156.1   8/31/05
015859.00003(56)

5. **Future Development.** Beginning one year after the completion of the development and opening of Offices as specified in Section 4 above, if necessary because of population growth in the New Territory, Franchisee agrees to establish additional Offices at a rate of at least one additional Office each year so as to have one Office for each five hundred thousand (500,000) persons residing in the New Territory based on the then current population of the New Territory (as found in the latest published edition of the Business Control Atlas, or if the Business Control Atlas is no longer published, then any comparable publication). Franchisee's minimum market penetration goals for the New Territory as set forth in Sections 4 and 5 of this Territory Amendment are collectively referred to as the **"New Territory Penetration Goals."** Franchisee may, at its option, without paying any additional Initial Fee, also open one or more additional Offices in the New Territory beyond the minimum required number of Offices.

6. **Failure to Meet New Territory Penetration Goals.**

   A. Franchisee's New Territory Penetration Goals under this Territory Amendment shall be a separate obligation. If Franchisee fails to meet its development obligations for the New Territory (and is not otherwise in default under the Franchise Agreement), LFI's rights and remedies shall be limited to the New Territory as provided in this Section 6. A failure by Franchisee to meet its New Territory Penetration Goals for the New Territory will not be deemed a general default under the Franchise Agreement, nor will it give rise to any remedies other than as set forth in this Section 6.

   B. If Franchisee fails to meet its New Territory Penetration Goals, LFI may reduce the New Territory thirty (30) days after giving Franchisee notice of the proposed reduction if Franchisee does not meet the New Territory Penetration Goals within the thirty (30) day period. Upon such a reduction, Franchisee's New Territory shall be reduced to an area within a 30 mile radius around each of Franchisee's operating Labor Finders Offices in the New Territory, but in any event not beyond or outside of the original boundaries of the New Territory (the **"Reduced New Territory"**), within which (1) Franchisee may establish additional Labor Finders Offices, and (2) neither LFI nor any other LFI franchisee may open a Labor Finders Office or service customers. After any reduction of the New Territory as provided in this Paragraph, all references to **"New Territory"** shall be deemed to refer to the **"Reduced New Territory."**

   C. If Franchisee fails to meet its New Territory Penetration Goals and LFI has reduced Franchisee's New Territory as provided in Paragraph 6.B above, Franchisee may continue to serve customers located outside the Reduced New Territory and within Franchisee's former New Territory (the **"Relinquished New Area"**) provided that they are customers to whom Franchisee provided services within the 30 day period immediately prior to the date of the notice from LFI of the proposed New Territory reduction pursuant to Paragraph 6.B above. Franchisee may not otherwise service customers outside of the Reduced New Territory.

   D. If Franchisee fails to meet its New Territory Penetration Goals and LFI has reduced Franchisee's New Territory as provided in Paragraph 6.B above, LFI may thereafter at any time, grant franchises to LFI Affiliates (as defined below) or other existing or new franchisees, to establish one or more additional Labor Finders Offices with exclusive territories to be located in the Relinquished New Area (but not within the Reduced New Territory), subject to the right of first refusal granted to Franchisee under Section 7 below. **"LFI Affiliate"** means any entity controlling, controlled by, or under common control with LFI.

7. **Franchisee's Right of First Refusal for Relinquished New Area.** If Franchisee fails to meet its New Territory Penetration Goals and LFI has reduced Franchisee's New Territory as provided in Paragraph 6.B above, and if Franchisee is not then in material default under the Franchise Agreement, Franchisee shall have a right of first refusal as provided in this Section 7 for any Labor Finders Office to be located in the Relinquished New Area. The terms of the right of first refusal for the Relinquished New Area, and the conditions, manner and timing of how the right of first refusal may be exercised, shall be as follows:

   A. If LFI has a bona-fide offer (from an LFI Affiliate, another existing Labor Finders franchisee or an independent prospective franchisee) to open one or more Labor Finders Offices to be located within the Relinquished Area, LFI shall provide Franchisee with notice of the offer, and a copy of LFI's then current form of Offering Circular, together with completed forms of the agreements

(which shall include LFI's then current form of franchise agreement), to be executed by Franchisee if Franchisee wishes to exercise its right of first refusal.

B. Franchisee may, at its option, accept the franchise (in its entirety and not partially) by signing and returning all of the franchise documents to LFI, together with all required fees and other payments; _provided, however,_ that Franchisee's right of first refusal shall expire thirty (30) days after LFI's Offering Circular and the completed copies of the documents to be signed are delivered to Franchisee. If Franchisee fails to respond to LFI within the thirty (30) day period, Franchisee shall be deemed to have rejected the right of first refusal.

C. If Franchisee exercises its right of first refusal and enters into the franchise agreement as described in Paragraph 7.A above, then: (1) Franchisee must open the first Labor Finders Office under the new franchise agreement within ninety (90) days after LFI's Offering Circular and the completed copies of the documents to be signed were delivered to Franchisee; and (2) Franchisee's right of first refusal as described in this Section 7 shall continue for any portion of the Relinquished Area not covered by the new franchise agreement.

D. If Franchisee rejects any right of first refusal (either directly or by failure to respond), Franchisee's rights of first refusal under this Section 7 shall automatically terminate entirely, and LFI may thereafter at any time, grant franchises to LFI Affiliates or other existing or new franchisees, to establish one or more additional Labor Finders Offices with exclusive territories to be located in the Relinquished Area (but not within the Reduced Territory), without providing Franchisee with any right of first refusal.

8. **Representations and Warranties.** As an inducement to LFI to enter into this Territory Amendment, Franchisee hereby represents and warrants to LFI as follows: (1) Franchisee is currently in good standing under the laws of the State specified in Section 1 above; (2) there has been no material adverse change in the information previously provided to LFI regarding Franchisee and its owners, officers, directors, managing partners and/or managing members; (3) each of the Confidentiality and Noncompetition Agreements and Guarantees executed by the owners, officers, directors, managing partners and/or managing members of Franchisee remain valid, binding, and in full force and effect and will automatically apply to this Territory Amendment; and (4) no default has occurred under the Franchise Agreement, nor under any other agreement between LFI and Franchisee, and no event has occurred which, with the passage of time, or the giving of notice, or both, would constitute such a default.

9. **Interpretation.** All capitalized terms used in this Territory Amendment shall have the meanings defined in the Franchise Agreement unless otherwise expressly defined in this Territory Amendment where they appear in quotation marks and bold face type. In the event of any conflict between the express provisions of this Territory Amendment and the Franchise Agreement, the terms of this Territory Amendment shall control. This Renewal Amendment is hereby incorporated by reference into the Franchise Agreement. All of the provisions of the Franchise Agreement shall remain in full force and effect, excepting only those particular terms that are expressly amended by this Territory Amendment.

IN WITNESS WHEREOF the Parties hereto have executed this Territory Amendment to be effective as of the Amendment Date stated in Section 2 of this Territory Amendment.

"FRANCHISEE":
Cheetah Staffing LLC,
an Illinois Limited Liability Company

By: _____

Its: _____President_____

"LFI":
LABOR FINDERS INTERNATIONAL, INC.,
a Florida Corporation

By: _____

Its: Director of Business Development